

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

HEALTHCARE ASSOCIATION OF NEW YORK STATE,
INC., NEW YORK ASSOCIATION OF HOMES AND
SERVICES FOR THE AGING, INC., NEW YORK STATE
HEALTH FACILITIES ASSOCIATION, INC., NYSARC,
INC., and UNITED CEREBRAL PALSY ASSOCIATIONS
OF NEW YORK STATE, INC.,

**COMPLAINT**

Plaintiffs,

    -against-

GEORGE E. PATAKI, Governor of the State of New York,
ELIOT SPITZER, Attorney General of the State of New York,
and LINDA ANGELLO, Commissioner of Labor of the State
of New York,

Defendants.

Plaintiffs, by their attorneys, O'Connell and Aronowitz, P.C., respectfully allege as

follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as

Plaintiffs' claims arise under the Supremacy Clause (Art. VI, cl. 2), as well as the First and

Fourteenth Amendments to the United States Constitution, guaranteeing free speech and due process of law, and further arise under the laws of the United States, specifically, the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, and the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 401 *et seq.*

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as this Court is sited in the judicial district where the Defendants reside and where a substantial part of the events giving rise to Plaintiff's claims have occurred, are now occurring, or will occur in the future. Some of Plaintiffs' own facilities and those of their employer members are situated in this district and are affected, and will continue to be affected, by the harms sought to be remedied in this Complaint.

## NATURE OF THE ACTION

3.     This proceeding seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202, declaring that New York Labor Law § 211-a, as last amended by Chapter 601 of the Laws of 2002 of the State of New York, is null and void on the grounds that it unconstitutionally infringes upon Plaintiffs' and/or their members' rights to freedom of speech and due process of law as protected by the United States Constitution, and is preempted by the National Labor Relations Act [29 U.S.C. § 151 *et seq.*], and the Labor Management Reporting and Disclosure Act [29 U.S.C. § 401 *et seq.*]. Plaintiffs also seek associated injunctive relief. A copy of Labor Law § 211-a, as amended, is annexed hereto as Exhibit "A".

2

4.      As more fully described, *infra*, Labor Law § 211-a prohibits an employer who receives funds appropriated by the State of New York from, *inter alia*, utilizing such funds to encourage or to discourage union organizing activities; it directs the Defendant Angello to promulgate regulations governing financial records which employers will be required to maintain to account for money spent to encourage or discourage unionization; and finally it empowers the Defendant Spitzer to enforce § 211-a by obtaining injunctive relief, restitution from employers of funds utilized in violation of the statute, and civil penalties for knowing violations thereof.

5.      Plaintiffs contend that Labor Law § 211-a is constitutionally infirm because it is excessively vague, and directly interferes with Plaintiffs' and/or their members' right to engage in free speech with their employees about the advantages and/or disadvantages of unionization, a right which is guaranteed not only by the United States Constitution but reaffirmed by the National Labor Relations Act itself.  Plaintiffs also contend that the law's attempt to impose certain record keeping requirements is preempted by the Federal Labor Management Reporting and Disclosure Act which already imposes detailed reporting requirements.

6.      The prohibitions of Labor Law § 211-a apply to Plaintiffs or their members as a result of their receipt of many types of state-appropriated funds, the most significant of which are payments pursuant to the State's Medical Assistance Program ("Medicaid").  Medicaid is a joint federal-state program established pursuant to Title XIX of the Federal Social Security Act [42 U.S.C. § 1396 *et seq.*] whereby states, such as New York, which

3

chose to participate in such program, are reimbursed, in part, by the federal government for the costs such states incur in reimbursing providers of certain types of health care and closely related health services which such providers give to medically needy and indigent individuals eligible for assistance under such programs. The federal share of the State's Medicaid payment to a provider is often called "federal financial participation." Federal financial participation is generally 50% of the Medicaid payments received by Plaintiffs or their members.

## PARTIES

### Plaintiffs

7.      The Healthcare Association of New York State, Inc. ("HANYS") is a not-for-profit trade association organized under the Not-For-Profit Corporation Law of the State of New York which represents over 550 not-for-profit and public hospitals, nursing homes, home health agencies, hospices and other similar health care providers throughout New York State (the "State"). Included in this membership are some 220 acute care hospitals that collectively provide the full spectrum of hospital inpatient and outpatient services. All of HANYS hospital members participate in, and provide services covered by, the Medicaid program. Payments for the provision of Medicaid services are made to HANYS members from funds appropriated for this purpose by the State. Medicaid accounts for as much as 75% of all revenue received by some hospitals.

4

8.      HANYS members also receive non-Medicaid funds from the State for the provision of a wide array of services.  For example, under section 2807 of the Public Health Law, teaching hospitals receive special funds to defray the costs of training interns and residents. Under the same section, hospitals are provided state-appropriated funds to support their provision of charity care and losses from bad debts.  The graduate medical education and bad debt/charity funds are disseminated to hospitals through the use of special state-operated pools that are funded from state-appropriated dollars. The total amount of these pool funds disseminated in 2001, the last year for which data is available, was about $820 million for bad debt/charity care and about $500 million for Graduate Medical Education, together accounting for about 5 - 6% of hospitals' total funding on a statewide average basis.

9.      All of HANYS's members are employers within the meaning of Labor Law § 211-a.  As a result of the amount and diversity of state-appropriated funds received by HANYS members, such members will be adversely affected by Labor Law § 211-a.

10.     The New York Association of Homes and Services for the Aging, Inc. ("NYAHSA") is a not-for-profit membership corporation organized under the laws of the State of New York. NYAHSA represents over 650 not-for-profit and publicly sponsored nursing facilities, home care agencies, adult care facilities, assisted living providers, continuing care retirement communities, senior housing facilities, adult day care providers, and other community services agencies serving people of all ages throughout New York State. Included in NYAHSA's membership are over 300 "nursing facilities," as defined in 42 U.S.C. § 1396r(a). NYAHSA's members are owned and operated by charitable, religious

5

and/or fraternal organizations, as well as by the State of New York and by county and municipal governments.

11.     NYAHSA member nursing facilities and other member organizations frequently own and operate other programs that are licensed under the Public Health Law and the Social Services Law and receive funding from the State's Medicaid program. These include adult day health care programs, long term home health care programs, certified home health agencies and assisted living programs. On average, Medicaid accounts for over 90 percent of the total revenues of adult day health care and long term home health care programs.

12.     All of NYAHSA's members are employers within the meaning of Labor Law § 211-a. As a result of the amount and diversity of state-appropriated funds received by NYAHSA members, such members will be adversely affected by Labor Law § 211-a.

13.     Plaintiff New York State Health Facilities Association, Inc. ("NYSHFA") is a not-for-profit trade association organized under the Not-For-Profit Corporation Law of the State of New York whose membership consists of nearly 300 residential health care facilities, which meet the definition of a "nursing facility" as defined in § 42 U.S.C. § 1396r(a). NYSHFA provides its membership with resident-oriented programs of continuing education, as well as consultation and direct services in the areas of administration, resident care, life safety, regulatory compliance, finance, reimbursement, legal and regulatory affairs. NYSHFA litigates on behalf of its members regarding issues of statewide importance to its

6

membership and relevant to the preservation of a statewide system of comprehensive, readily accessible, cost-effective and high-quality health care.

14.     All of NYSHFA's members are employers within the meaning of Labor Law § 211-a.  As a result of the amount of state-appropriated funds received by NYSHFA members, such members will be adversely affected by Labor Law § 211-a.

15.     Virtually all of NYAHSA's and NYSHFA's nursing facility members participate in the Medicaid program and are reimbursed by the State for the care they provide to sick and elderly residents eligible for assistance under such programs at rates established by the State in accordance with Article 28 of the Public Health Law of the State of New York and regulations promulgated pursuant thereto which are set forth in Subpart 86-2 of Title 10 of the Official Compilation of Codes, Rules and Regulations of the State of New York (10 N.Y.C.R.R. § 86-2.1 *et seq.*).

16.     Most of NYAHSA's and NYSHFA's member facilities receive the majority of their revenue from Medicaid and some receive virtually all of their revenue from Medicaid.  The reimbursement that NYAHSA's and NYSHFA's members receive from the Medicaid program is not determined by the costs they will incur with respect to encouraging or discouraging any future unionization effort since, under the reimbursement methodology set forth in Public Health Law Article 28 and 10 N.Y.C.R.R. Subpart 86-2, rates are established on a modified pricing system that takes into account past operating costs, but not future costs.

7

17. NYSARC, Inc. ("NYSARC") (formerly known as New York State Association for Retarded Children) is a New York not-for-profit membership organization founded by parents, families and friends of persons with mental retardation and other developmental disabilities to provide advocacy to and services for persons with mental retardation.

18. NYSARC is a single corporation that operates statewide through its chapters located in 61 out of 62 New York counties. In addition to providing assistance and oversight to its individual chapters, the state office provides advocacy with respect to legislation and policy issues at the state and national levels. The county chapters operate a variety of programs that provide services for persons with mental retardation and other developmental disabilities.

19. Each NYSARC chapter develops its own annual operating budget and operates under separately issued provider ID numbers from the New York State Office of Mental Retardation and Developmental Disabilities (OMRDD). The programs operated by NYSARC through its chapters are, for the most part, certified, authorized and funded by OMRDD. Approximately 90% of the operating revenues for NYSARC chapters are state-appropriated funds. The remaining funds consist of items such as donations, investment revenue from foundations, revenue from contract sales to the public, and other non-state sources.

20. Numerous NYSARC chapters have recently been confronted with union organizing activity. Upon information and belief, since January 1, 2003, written labor union

fliers and other materials have been distributed to NYSARC chapter employees at Schenectady, Saratoga, Albany, Rensselaer, Fulton, Essex, and Dutchess.

21.     NYSARC is an employer within the meaning of Labor Law § 211-a.  As a result of the amount of state-appropriated funds received by NYSARC, it will be adversely affected by Labor Law § 211-a.

22.     United Cerebral Palsy Associations of New York State, Inc., d/b/a Cerebral Palsy Associations of New York State, ("CPNYS") is a New York not-for-profit corporation that both directly provides residential, clinical, health, medical, rehabilitation and habilitation education and other services to individuals with developmental disabilities and their families, and serves as a statewide association of providers of like services.

23.     As a statewide association representing 22 separately incorporated affiliates providing programs and services in every county of New York State, CPNYS provides technical assistance and support, statewide committee facilitation, conferences and training, networking and statewide programs such as the Home Service Program. In addition, CPNYS engages in legislative liaison and advocacy with governmental agencies on both statewide issues of public policy and issues affecting one or more individual member agencies. CPNYS also engages in a variety of public education programs on behalf of its members and the individuals they serve. Finally, CPNYS litigates on behalf of its members regarding issues of statewide importance to its membership as they relate to the preservation of a statewide system of comprehensive, readily accessible, cost-effective and high quality programs and services for individuals with developmental disabilities.

9

24.     As a direct provider of services,  CPNYS itself operates approximately 90 community residences, in addition to day programs and diagnostic and treatment centers providing the full range of health, clinical and habilitative services, and transportation services. CPNYS, is the largest provider of direct services in its network of programs, and operates under licenses from the New York State Office of Mental Retardation and Developmental Disabilities, Department of Health, and State Education Department.

25.     CPNYS is currently undergoing a unionization drive.  While its direct care employees have been represented by a union for over 20 years, in the past few months, the union representing the direct care employees has been soliciting and attempting to recruit clinical, nursing and other professional employees.  CPNYS is aware of meetings at the union's headquarters that were called for these professionals, and several voice mail messages and flyers have been distributed.  Additionally, an official of this union has directly informed officials of CPNYS that the union intended to organize both direct care employees and professional staff at OMRDD-licensed agencies throughout New York State within the next few years.

26.     CPNYS itself obtains over 99% of its revenues from state-appropriated sources, primarily Medicaid.  Additionally, the 22 affiliates each obtain approximately 95% of their revenues from state-appropriated sources, again primarily Medicaid. The remainder of the revenues are divided into program related revenues, and fund-raising. Program related revenues include Medicare, private insurance and private pay funds, and are used to pay for

services rendered to consumers. Fund-raising revenues may be dedicated to specific purposes, such as a capital fund.

27. CPNYS itself is an employer, as are all of its affiliates within the meaning of Labor Law § 211-a, and will be adversely affected by Labor Law § 211-a.

28. HANYS, NYAHSA, NYSHFA, NYSARC and CPNYS themselves and/or their members, chapters and affiliates (collectively "Plaintiff Associations") all receive state-appropriated monies, including Medicaid funds particularly, and other state-appropriated funds generally, to pay for services rendered. No restrictions on the use of such funds are contained within the Medicaid statute and other relevant funding statutes. Plaintiff Associations are either currently facing union organizing campaigns or reasonably expect to be subjected to union organizing campaigns in the near future. In fact, Labor Law § 211-a will encourage union organizing campaigns against Plaintiff Associations because the statute impairs the ability of these employers to communicate with their own employees regarding the benefits and disadvantages of unionization.

29. Each of the Plaintiff Associations or their members operates or provides services within the Northern District of New York.

### Defendants

30. Defendant George E. Pataki is the Governor of the State of New York, charged with the responsibility of executing the laws of the State.

11

31.     Defendant Eliot Spitzer is the Attorney General of the State of New York and, as detailed *infra*, is given authority under New York Labor Law § 211-a(4) to commence judicial proceedings to enforce its provisions.

32.     Defendant Linda Angello is the Commissioner of Labor of the State of New York who is directed by Labor Law § 211-a(5) to promulgate regulations regarding the elaborate bookkeeping and financial records employees will be required to maintain under the statute.

## NEW YORK LABOR LAW § 211-a

33.     In the autumn of 2002, the New York State Legislature passed and Governor Pataki signed into law Chapter 601 of the Laws of 2002, which became effective on December 29, 2002.

34.     The purpose and effect of this law is and will be to infringe upon the ability of employers to communicate with their employees in opposition to efforts to unionize those employees.  Accordingly, for purposes of this Complaint this statute shall hereafter be referred to as the "Employer Gag Law".

35.     The press release issued by Governor George Pataki, with statements by other notable political figures, demonstrates that despite its neutral language, the Employer Gag Law's purpose is to prohibit employers from exercising their right to speak against unionization. A copy of the press release is attached hereto as Exhibit "B". Assembly Speaker Sheldon Silver is quoted as stating "Funds provided by the State for programmatic

12

purposes should not be subverted in an effort to union bust." In describing the Employer Gag Law, the New York State AFL-CIO President is quoted as stating, "It ensures that taxpayer dollars will not be used to interfere with a worker's constitutional right to join a union." UNITE! President Bruce Raynor is quoted as stating "This important legislation will provide much needed protection for workers seeking to organize unions."

36. The Employer Gag Law amended Section 211-a of the New York State Labor Law. This action challenges Section 211-a, not just its amendment by Ch. 601, L. 2002.

37. The purported legislative purpose stated in Ch. 601 for the Employer Gag Law was to ensure that funds appropriated by the Legislature for the purchase of goods and provision of needed services are ultimately expended solely for the purpose for which they were appropriated.

38. The true purpose and the direct effect of Labor Law § 211-a is to prevent one side in a union organizing campaign - the employer - from exercising its right to free speech under the First Amendment to the United States Constitution and the National Labor Relations Act, by impairing the employer's ability to take legitimate steps authorized by federal law in the context of a union organizing campaign.

39. Significantly, the prohibitions of Labor Law § 211-a apply even though the Medicaid payments are for services already rendered. As such, it is impossible for the prohibitions of Labor Law § 211-a to further their stated purpose of ensuring that the funds are used for the purpose for which they were appropriated.

13

40.     The prohibitions of Labor Law § 211-a apply irrespective of whether an employer is currently undergoing a union organizing campaign.

41.     Paragraph 1 of New York Labor Law § 211-a purports to state the legislation's purpose. It provides that:

> The legislature hereby finds and declares that sound fiscal management requires vigilance to ensure that funds appropriated by the legislature for the purchase of goods and provision of needed services are ultimately expended solely for the purpose for which they were appropriated. The legislature finds and declares that when public funds are appropriated for the purchase of specific goods and/or the provision of needed services, and those funds are instead used to encourage or discourage union organization, the proprietary interests of this state are adversely affected. As a result, the legislature declares that the use of state funds and property to encourage or discourage employees from union organization constitutes a misuse of the public funds and a misapplication of scarce public resources, which should be utilized solely for the public purpose for which they were appropriated.

42.     Paragraph 2 of New York Labor Law § 211-a precludes the use of these funds for employer speech and activity concerning union organizing. It provides that:

> Notwithstanding any other provision of law, no monies appropriated by the state for any purpose shall be used or made available to employers to: (a) train managers, supervisors or other administrative personnel regarding methods to encourage or discourage union organization, or to encourage or discourage an employee from participating in a union organizing drive; (b) hire or pay attorneys, consultants or other contractors to encourage or discourage union organization, or to encourage or discourage an employee from participating in a union organizing drive; or (c) hire employees or pay the salary and other compensation of employees whose principal job duties are to encourage or

14

> discourage union organization, or to encourage or discourage
> an employee from participating in a union organizing drive.

43.     Paragraph 3 of New York Labor Law § 211-a requires detailed financial

recordkeeping.  It provides that:

> Any employer that utilizes funds appropriated by the state and
> engages in such activities shall maintain, for a period of not
> less than three years from the date of such activities, financial
> records, audited as to their validity and accuracy, sufficient to
> show that state funds were not used to pay for such activities.
> An employer shall make such financial records available to
> the state entity that provided such funds and the attorney
> general within ten business days of receipt of a request from
> such entity or the attorney general for such records.

44.     Paragraph 4 of New York Labor Law § 211-a authorizes the Attorney General

to enforce the statute and provides for onerous civil penalties for violations.  Specifically it

provides that:

> The attorney general may apply in the name of the people of
> the state of New York for an order enjoining or restraining the
> commission or continuance of the alleged violation of this
> section. In any such proceeding, the court may order the
> return to the state of the unlawfully expended funds. Further,
> the court may impose a civil penalty not to exceed one
> thousand dollars where it has been shown that an employer
> engaged in a violation of subdivision two of this section;
> provided, however, that a court may impose a civil penalty
> not to exceed one thousand dollars or three times the amount
> of money unlawfully expended, whichever is greater, where
> it is shown that the employer knowingly engaged in a
> violation of subdivision two of this section or where the
> employer previously had been found to have violated
> subdivision two within the preceding two years. All monies

15

collected pursuant to this section shall be deposited in the state general fund.

45.     Paragraph 5 of New York Labor Law § 211-a directs the Commissioner of Labor to (a) promulgate regulations describing the form and content of the required financial records; and (b) provide advice and guidance to state entities subject to the provisions of this section as to the implementation of contractual and administrative measures to enforce the purposes of this section. No regulations have as yet been promulgated, but the constitutional infirmities of this legislation cannot be cured by regulations that the Commissioner of Labor is directed to promulgate.

## EFFECT OF SECTION 211-a

46.     New York Labor Law § 211-a applies to any employer who receives state-appropriated funds, no matter how small the payment or what goods or services are being purchased.

47.     The prohibitions of New York Labor Law § 211-a apply to monies the ownership and control of which have already been transferred to the recipient. For example, with respect to Medicaid funds, the State pays the employer after the health care service has been rendered. At such time, although the funds originated in part from some State fund, ownership and the right to control the use of such funds has transferred to the employer. There is no "constructive trust" or "earmarking" of these funds for specific, future use.

16

48.     While the purported purpose of New York Labor Law § 211-a is to ensure that funds are ultimately expended solely for the purpose for which they were appropriated, the prohibitions contained within New York Labor Law § 211-a not only do not effectuate this purpose at all, the statutory proscriptions have no relation to such legislative objective.

49.     Specifically, Labor Law § 211-a does not direct in any way whatsoever how funds are to be spent,  just one ambiguous way in which they may not be spent.  The only restriction is of an employer's protected right, under the First Amendment to the United States Constitution and the NLRA, to voice its non-coercive opinion on unionization.

50.     New York Labor Law § 211-a does not prohibit the use of state-appropriated funds for any other unrelated purpose, regardless of how worthy or frivolous such expenditures may be.  For example, it  does not require that Medicaid funds be spent for equipment, salaries or other health-related purposes.  Thus, since the funding statutes do not limit the expenditures that may be made with such funds, the only illegal spending under section 211-a is spending on protected activities.

51.     Plaintiff Associations that are facing a union organizing campaign or reasonably expect to be subjected to a union organizing campaign in the near future may or may not believe that unionization would be in the best interests of their facilities or their employees.  Regardless of these beliefs, Plaintiff Associations will want to communicate with their employees about the advantages and disadvantages of unionization.  In order to do so, these employers will need to or intend to spend funds, including state-appropriated monies, (a) to train managers, supervisors or other administrative personnel regarding

17

encouraging or discouraging union organization; (b) to hire or pay attorneys, consultants or other contractors to act as the representatives of the employer regarding union organization; and/or (c) to hire or pay the salaries of employees who will principally be involved in encouraging or discouraging union organization.

52.     But for the prohibition of New York Labor Law § 211-a, Plaintiff Associations would spend state-appropriated monies, over which they now have complete ownership and the right to control, for the purposes prohibited by section 211-a.

53.     Upon information and belief, the Defendants consider the prohibitions of New York Labor Law § 211-a to apply to Medicaid funds received by Plaintiff Associations and Defendant Spitzer intends to enforce section 211-a with respect to such Medicaid payments, including the federal financial participation in such Medicaid payments, as well as with respect to other federal monies that are re-appropriated by the State.

54.     If Plaintiff Associations were to spend Medicaid or other state-appropriated monies for such purposes, they would be subject to prosecution under New York Labor Law § 211-a. If they were unable to spend such monies for these purposes, it would preclude or impair their ability to encourage or discourage unionization, or to do any acts or make any speech that would violate section 211-a.

55.     In addition, Plaintiff Associations could be subject to criminal prosecution under New York Labor Law § 213, which provides a maximum penalty of a fine of up to five hundred dollars and/or imprisonment for up to sixty days.

18

56.     Plaintiff Associations, therefore, are faced with the choice of (a) violating the law and facing civil and/or criminal prosecution; or (b) changing their present and intended speech and not engage in federally protected and constitutional speech and activities that they would otherwise engage in.

## LAWS GOVERNING UNION ORGANIZING

57.     The union organizing process is regulated by the National Labor Relations Act ("NLRA") [29 U.S.C. § 151 *et seq.*]. The NLRA is the primary law governing relations between unions and employers in the private sector.

58.     The National Labor Relations Board ("NLRB") is an independent federal agency created by Congress in 1935 to administer the National Labor Relations Act. The NLRB has primary jurisdiction over the interpretation and application of the NLRA. One of the NLRB's principal functions is to prevent and remedy unlawful acts, called unfair labor practices, by either employers or unions.

59.     Section 7 of the NLRA [29 U.S.C. § 157] guarantees employees the right to unionize and bargain collectively. Section 8 of the NLRA [29 U.S.C. § 158], governs unfair labor practices by employers and labor organizations during a union organizing campaign.

60.     Section 8(c) of the NLRA codifies an employer's right to free speech in the context of a union organizing campaign. It provides that:

> Expression of views without threat of reprisal or force or promise of benefit. The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written,

> printed, graphic, or visual form, shall not constitute or be
> evidence of an unfair labor practice under any of the
> provisions of this Act, if such expression contains no threat of
> reprisal or force or promise of benefit.

61.     Pursuant to section 8(c) of the NLRA, an employer is lawfully entitled to engage in speech and activity that would be proscribed by Labor Law § 211-a if supported by state-appropriated funds.

62.     In addition to the NLRA, the Labor-Management Reporting and Disclosure Act ("LMRDA") [29 U.S.C. §§ 401 *et seq.*] imposes specific recordkeeping and reporting requirements related to union organizing activities.

63.     Under the LMRDA, employer agreements with labor relations consultants, as well as payments to such consultants, for the direct or indirect purpose of persuading employees "to exercise or not to exercise . . . the right to organize and bargain collectively," or for the purpose of providing the employer with information concerning "the activities of employees or a labor organization in connection with a labor dispute" must be reported to the U.S. Labor Department [29 U.S.C. § 433(a)(4)].

64.     Under the LMRDA, labor relations consultants must also file detailed reports with the Secretary of Labor with respect to such agreements with employers [29 U.S.C. § 433(b)].

65.     The LMRDA [29 U.S.C. § 433(e)] further expressly provides that:

> Nothing contained in this section shall be construed to require
> any regular officer, supervisor, or employee of an employer to
> file a report in connection with services rendered to such
> employer nor shall any employer be required to file a report

20

> covering expenditures made to any regular officer, supervisor,
> or employee of an employer as compensation for service as a
> regular officer, supervisor, or employee of such employer.

66.     The LMRDA accommodates the employer's free speech rights under Section

8(c) of the NLRA, by explicitly stating that "[n]othing contained in this section shall be

construed as an amendment to, or modification of the rights protected by, section 158(c) of

this title." [29 U.S.C. § 433(f)].

67.     The provisions of Labor Law § 211-a, and particularly paragraphs (2) and (3),

impose recordkeeping and reporting requirements that are addressed by the LMRDA, and/or

are prohibited by the LMRDA.

## FREEDOM OF SPEECH

68.     The First Amendment to the United States Constitution provides that:

> Congress shall make no law respecting an establishment of
> religion, or prohibiting the free exercise thereof; or abridging
> the freedom of speech, or of the press; or the right of the
> people peaceably to assemble, and to petition the Government
> for a redress of grievances.

69.     The freedoms guaranteed by the First Amendment include speech by

commercial entities, including the speech of Plaintiff Associations, and covering issues

relating to encouraging and discouraging union organization.  This prohibition is made

applicable to the State of New York by the Fourteenth Amendment to the United States

Constitution.

70.     In order to effectively engage in such protected speech, these employers must be able to expend state-appropriated funds for the purposes proscribed by New York Labor Law § 211-a.

71.     New York Labor Law § 211-a deprives Plaintiff Associations and their members of rights guaranteed by the First and Fourteenth Amendments to the United States Constitution, including prohibiting them from using state-appropriated monies to effectively communicate such speech, hire consultants or attorneys to speak on behalf of the employers, and to pay the salaries of persons primarily engaged in such activities.

72.     New York Labor Law § 211-a also deprives Plaintiff Associations of First Amendment rights by threatening substantial penalties for the exercise of such First Amendment rights through statutory requirements that are excessively vague.

73.     The substantial penalties used to deprive Plaintiff Associations of their First Amendment rights include significant civil penalties under Labor Law § 211-a, including the return of such expended funds, notwithstanding their having been lawfully earned or received, and one thousand dollars or three times the funds expended, whichever is greater, as well as the possibility of criminal prosecution under Labor Law § 213, which provides a maximum penalty of a fine of up to five hundred dollars and/or imprisonment for up to sixty days.

22

## DUE PROCESS OF LAW

74.   The Fourteenth Amendment to the United States Constitution provides that:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

75.   The Due Process Clause provides both substantive and procedural protections to persons, including Plaintiff Associations. The Due Process Clause requires that statutory prohibitions which can result in substantial penalties for their violation be clearly defined, so that a person of reasonable intelligence may know what is prohibited and to conform his conduct accordingly, and to avoid arbitrary and discriminatory enforcement.

76.   New York Labor Law § 211-a deprives Plaintiff Associations of this right guaranteed by the Due Process Clause by imposing substantial penalties based upon statutory requirements that are excessively vague, and the scope of which is left to the Defendant Spitzer to determine.

77.   The Due Process Clause also provides protection against the State of New York's undue interference with the fundamental right of Plaintiff Associations to control the use of their property.

## PLAINTIFFS' FIRST CLAIM FOR DECLARATORY RELIEF
(Preemption by National Labor Relations Act)

78.     The NLRA affirmatively protects an employer's right to express its views, arguments, or opinions on unionization if such views do not contain any threat of reprisal or force or promise of benefit.

79.     The NLRA has so occupied the field with respect to activities within sections 7 or 8 of the NLRA that any state action within that field is preempted.  The restrictions on speech and conduct imposed by Labor Law § 211-a fall within the field occupied by the NLRA.

80.     Defendants' intended enforcement of New York Labor Law § 211-a with respect to the federal financial participation in Medicaid payments, and other state-appropriated funds received pursuant to federal appropriations, conflicts with the NLRA.

81.     With respect to those areas in which the NLRA has not occupied the field as to activities governed by New York Labor Law § 211-a, Congress intended that such areas would be unregulated by the states.  The restrictions imposed by Labor Law § 211-a intrude into areas that Congress intended would be unregulated by the states.

82.     As a result, New York Labor Law § 211-a is preempted by the National Labor Relations Act and is therefore void and unenforceable.

24

## PLAINTIFFS' SECOND CLAIM FOR DECLARATORY RELIEF
(Preemption by Labor Management Relations Disclosure Act)

83.   The LMRDA comprehensively regulates the reports that employers, labor relations consultants, labor organizations, and officers and employees of labor organizations must make to the public regarding labor relations issues.

84.   The LMRDA has so occupied the field with respect to reporting requirements provided by New York Labor Law § 211-a that any such state action is preempted.  The reporting requirements imposed by Labor Law § 211-a fall within the field occupied by the LMRDA.

85.   With respect to those areas in which the LMRDA has not occupied the field as to activities governed by New York Labor Law § 211-a, Congress intended that such areas would be unregulated.  The reporting requirements imposed by Labor Law § 211-a intrude into areas that Congress intended would be unregulated by the states.

86.   As a result New York Labor Law § 211-a is preempted by the LMRDA and is therefore void and unenforceable.

## PLAINTIFFS' THIRD CLAIM FOR DECLARATORY RELIEF
(Violation of First Amendment to United States Constitution)

87.   New York Labor Law § 211-a violates Plaintiff Associations' right to freedom of speech under the First and Fourteenth Amendments by engaging in content-based discrimination by imposing a restraint on an employer's ability to communicate with

25

employees with respect to unionization if such communication is funded by state-appropriated monies.

88.    New York Labor Law § 211-a violates Plaintiff Associations' right to freedom of speech under the First and Fourteenth Amendments by engaging in viewpoint-based discrimination by allowing unions and employees to encourage union organizing while precluding or impairing the ability of the employer to exercise protected free speech by prohibiting an employer from using state-appropriated monies to hire consultants, attorneys or other representatives to speak on behalf of employers to discourage unionization.

89.    New York Labor Law § 211-a violates Plaintiff Associations' right to freedom of speech under the First and Fourth Amendments by impairing or precluding the ability to engage in lawful and protected speech.

90.    New York Labor Law § 211-a violates Plaintiff Associations' right to freedom of speech under the First and Fourteenth Amendments by engaging in prior restraint of speech, having conferred upon the Defendant Spitzer the authority to apply to enjoin the commission of acts in violation of Labor Law § 211-a.

91.    New York Labor Law § 211-a violates Plaintiff Associations' right to freedom of speech under the First and Fourteenth Amendments by subjecting Plaintiff Associations' speech to unconstitutionally vague proscriptions, and subjecting Plaintiff Associations to penalties for violations of such proscriptions.

92.     As a result, New York Labor Law § 211-a violates rights guaranteed by the First and Fourteenth Amendments to the United States Constitution and is therefore void and unenforceable.

## PLAINTIFFS' FOURTH CLAIM FOR DECLARATORY RELIEF
(Violation of Fourteenth Amendment to United States Constitution -
Procedural Due Process)

93.     New York Labor Law § 211-a violates Plaintiff Associations' right to due process under the Fourteenth Amendment by failing to give adequate notice of the speech and activity that is proscribed and of the funds that may not be used in support of such speech and activities by threatening and authorizing substantial penalties for violations, and for delegating to Defendant Spitzer the authority and responsibility to determine what conduct violates the statute.

94.     As a result, New York Labor Law § 211-a violates rights guaranteed by the Fourteenth Amendment to the United States Constitution and is therefore void and unenforceable.

## PLAINTIFFS' FIFTH CLAIM FOR DECLARATORY RELIEF
(Violation of Fourteenth Amendment to United States Constitution -
Substantive Due Process)

95.     New York Labor Law § 211-a deprives Plaintiff Associations of substantive due process rights by unduly interfering with their fundamental rights over the use of their own property.

27

96.     New York Labor Law § 211-a deprives Plaintiff Associations of substantive due process rights by restricting use of property, and imposing penalties for speech and activity, which restrictions (a) do not further a compelling or legitimate state objective; (b) are not necessary to further the claimed state objective; and (c) are not the least restrictive method of achieving the purported state objective.

97.     As a result, New York Labor Law § 211-a violates the substantive due process protections of the Fourteenth Amendment to the United States Constitution and is void and unenforceable.

**WHEREFORE**, Plaintiffs respectfully request this Court grant judgment:

(a)     declaring New York Labor Law 211-a to be preempted by the National Labor Relations Act;

(b)     declaring New York Labor Law 211-a to be preempted by the Labor Management Relations Disclosure Act;

(c)     declaring New York Labor Law 211-a to be unconstitutional, and, therefore, void and unenforceable as violative of rights guaranteed by the First Amendment to the United States Constitution, applied to the State of New York by the Fourteenth Amendment to the United States Constitution;

(d)     declaring New York Labor Law 211-a to be unconstitutional, and, therefore, void and unenforceable as violative of rights guaranteed by the Fourteenth Amendment to the United States Constitution;

(e)     permanently enjoining Defendants from implementing or enforcing New York Labor Law § 211-a; and

28

(f)     awarding Plaintiffs costs, disbursements and such other and further relief as

the Court may deem appropriate.

DATED:      Albany, New York          Respectfully submitted,
            April 3, 2003

                                      O'CONNELL AND ARONOWITZ

                                      By: _____
                                            Jeffrey J. Sherrin (JS 5129)
                                      Attorneys for Plaintiffs
                                      Office and P.O. Address
                                      54 State Street
                                      Albany NY 12207-2501
                                      (518) 462-5601

G:\DATA\ATTORNEY\JJS\HANYS\Union Neutrality\CpFedCt-NDNY.wpd

# EXHIBIT  A

LEXSTAT ny labor law 211-a

NEW YORK CONSOLIDATED LAW SERVICE
Copyright (c) 2003 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

\*\*\* THIS SECTION IS CURRENT THROUGH CH. 9, 02/27/2003 \*\*\*
\*\*\* WITH THE EXCEPTION OF CHS. 1-3 \*\*\*

LABOR LAW

ARTICLE 7.  GENERAL PROVISIONS

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

NY CLS Labor § 211-a (2003)

§ 211-a.  Prohibition against use of funds

1. (Added, L 2002) The legislature hereby finds and declares that sound fiscal management requires vigilance to ensure that funds appropriated by the legislature for the purchase of goods and provision of needed services are ultimately expended solely for the purpose for which they were appropriated. The legislature finds and declares that when public funds are appropriated for the purchase of specific goods and/or the provision of needed services, and those funds are instead used to encourage or discourage union organization, the proprietary interests of this state are adversely affected. As a result, the legislature declares that the use of state funds and property to encourage or discourage employees from union organization constitutes a misuse of the public funds and a misapplication of scarce public resources, which should be utilized solely for the public purpose for which they were appropriated.

2. Notwithstanding any other provision of law, no monies appropriated by the state for any purpose shall be used or made available to employers to: (a) train managers, supervisors or other administrative personnel regarding methods to encourage or discourage union organization, or to encourage or discourage an employee from participating in a union organizing drive; (b) hire or pay attorneys, consultants or other contractors to encourage or discourage union organization, or to encourage or discourage an employee from participating in a union organizing drive; or (c) hire employees or pay the salary and other compensation of employees whose principal job duties are to encourage or discourage union organization, or to encourage or discourage an employee from participating in a union organizing drive.

3. (Added, L 2002) Any employer that utilizes funds appropriated by the state and engages in such activities shall maintain, for a period of not less than three years from the date of such activities, financial records, audited as to their validity and accuracy, sufficient to show that state funds were not used to pay for such activities. An employer shall make such financial records available to the state entity that provided such funds and the attorney general within ten business days of receipt of a request from such entity or the attorney general for such records.

4. (Added, L 2002) The attorney general may apply in the name of the people of the state of New York for an order enjoining or restraining the commission or continuance of the alleged violation of this section. In any such proceeding, the court may order the return to the state of the unlawfully expended funds. Further, the court may impose a civil penalty not to exceed one thousand dollars where it has been shown that an employer engaged in a violation of subdivision two of this section; provided, however, that a court may impose a civil penalty not to exceed one thousand dollars or three times the amount of money unlawfully expended, whichever is greater, where it is shown that the employer knowingly engaged in a violation of subdivision two of this section or where the employer previously had been found to have violated subdivision two within the preceding two years. All monies collected pursuant to this section shall be deposited in the state general fund.

5. (Added, L 2002) The commissioner shall promulgate regulations describing the form and content of the financial records required pursuant to this section, and the commissioner shall provide advice and guidance to state entities subject to the provisions of this section as to the implementation of contractual and administrative measures to enforce the purposes of

this section.

HISTORY:   Add, L 1996, ch 453, § 1, eff Oct 7, 1996; amd, L 2002, ch 601, § 1, eff Dec 29, 2002.
   Sub 1, add, L 2002, ch 601, § 1, eff Dec 29, 2002.
   Sub 2, formerly part of entire section, so designated sub 2 and amd, L 2002, ch 601, § 1, eff Dec 29, 2002.
   Sub 3, add, L 2002, ch 601, § 1, eff Dec 29, 2002.
   Sub 4, add, L 2002, ch 601, § 1, eff Dec 29, 2002.
   Sub 5, add, L 2002, ch 601, § 1, eff Dec 29, 2002.

# EXHIBIT  B

**FOR IMMEDIATE RELEASE:**
**September 30, 2002**

## GOVERNOR PATAKI SIGNS LABOR NEUTRALITY BILL

### Prohibits the Use of Tax Dollars for Pro-Union or Anti-Union Activities

Governor George E. Pataki today signed into law legislation designed to ensure that State tax dollars appropriated by the Legislature cannot be used to either encourage or discourage employees from engaging in union organization activities.

"This new law will protect taxpayers by ensuring that State tax dollars are used for their intended purpose, instead of being diverted to promote or discourage union organizing activities," Governor Pataki said. "This carefully crafted measure strikes the appropriate balance between addressing the concerns of organized labor, the concerns of the business community, and the concerns of hard-working taxpayers, while protecting the rights of workers in New York State."

The legislation clarifies an existing section of law that was enacted in 1996. It reinforces provisions stating that no monies appropriated by the State for any purpose shall be made available to employers to train managers, supervisors or other administrative personnel regarding methods to encourage or discourage union organization, or to encourage or discourage employees from participating in union organizing drives.

Senate Majority Leader Joseph L. Bruno said, "This measure will protect employee rights, and continue to balance the concerns of management and unions while ultimately helping to maintain a level playing field when unions seek to organize. It is truly a neutrality law that will ensure that state funding is being used for the purposes intended and I applaud Governor Pataki for signing it into law."

Assembly Speaker Sheldon Silver said, "Funds provided by the State for programmatic purposes should not be subverted in an effort to union bust. Worker protection has long been a cornerstone of the Assembly's legislative agenda. This law continues that effort, while at the same time providing assurances that those in need of services provided by the state receive them."

Senator Guy Vellela said, "This new law is truly a 'neutrality bill'. This law makes sure that state funding is being used for the purposes intended. We will be taking the politics out of this issue by allowing neither labor nor management to use taxpayer money to encourage or discourage New York's Labor Movement."

Assemblywoman Cathy Nolan said, "This common-sense measure protects taxpayers, workers and those who rely on state-provided services by insuring that money allocated by the state is used as intended. As chair of the Assembly Labor committee, I am proud of this new law and what it will accomplish."

New York State AFL-CIO President Denis Hughes said, "This historic legislation not only protects the rights and interests of working men and women, but all New Yorkers. It ensures that taxpayer dollars will not be used to interfere with a worker's constitutional right to join a union. I am proud to stand here today with Governor Pataki as he signs this historic bill into law."

UNITE! President Bruce Raynor said, "This important legislation will provide much needed protection for workers seeking to organize unions."

State Labor Commissioner Linda Angello said, "This legislation protects the integrity of the organization process by ensuring that State funds are not used to influence the process in any way. By making the law balanced, this new law benefits workers, businesses and the people of New York State."

The new law will further restrict the ability of employers to use public funds to hire or pay attorneys, consultants or other contractors that encourage or discourage union organization, or participation in organizing drives, or to hire or pay the salary of employees whose principal job duties are to encourage or discourage union organization or

participation in drives.

Employers who receive State funds, and who engage in the prohibited activities, will be required to maintain financial records sufficient to show that state funds have not been utilized inappropriately. These records must be audited to ensure that State funds were not used to pay for activities that are prohibited under the terms of the legislation. Employers must make such records available to the State entity that provided such funds and the Attorney General within 10 business days of a request.

Under the new law, the Attorney General may apply for orders enjoining or restraining an organization from using State funds for the commission or continuance of activities that are specifically prohibited under the legislation. The Commissioner of Labor will promulgate regulations describing the form and content of the financial records that must be maintained by the recipients of such funds. The courts will have jurisdiction to order the return of any State funds that are utilized for the promotion or discouragement of union organizing activities. The court may also impose other civil penalties of up to $1,000 for a violation of this act, or three times the amount of State funding in question for knowing violations and in cases where the employer also had previous violations.

The legislation is effective within 90 days of becoming law. ###

---

**Return to the Press Releases**
**Return to the Office of the Governor**