UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

HEALTHCARE ASSOCIATION OF NEW YORK STATE,
INC.; NEW YORK ASSOCIATION OF HOMES AND
SERVICES FOR THE AGING, INC.; NEW YORK STATE
HEALTH FACILITIES ASSOCIATION, INC.; NYSARC,
INC.; UNITED CEREBRAL PALSY ASSOCIATIONS OF
NEW YORK STATE, INC.,

                    Plaintiffs,             1:03-CV-0413

      -v-

GEORGE E. PATAKI, Governor of the State of New York;
ELIOT SPITZER, Attorney General of the State of New
York; LINDA ANGELLO, Commissioner of Labor of the
State of New York,

                Defendants.

---

APPEARANCES:                      OF COUNSEL:

O'CONNELL AND ARONOWITZ      JEFFREY J. SHERRIN, ESQ.
Attorneys for Plaintiffs
54 State Street
Albany, NY 12207-2501

HON. ELIOT SPITZER           SETH KUPFERBERG, ESQ.
Attorney for Defendants       Assistant Attorney General
120 Broadway, 26th Floor
New York, NY 10271

HON. ELIOT SPITZER           STEPHEN M. KERWIN, ESQ.
Attorney for Defendants       Assistant Attorney General
The Capitol
Albany, NY 12224

1

JONES DAY
Attorneys for *Amici Curiae*
 Chamber of Commerce of the
 United States of America, et al.
51 Louisiana Avenue, NW
Washington, D.C. 20001

WILLIS J. GOLDSMITH, ESQ.
YOORA PAK, ESQ.

WHITEMAN OSTERMAN 7 HANNA
Attorneys for *Amicus Curiae*
 New York State Association
 of Health Care Providers, Inc.
One Commerce Plaza
Albany, NY 12260

JOEL L. HODES, ESQ.

BRENNAN CENTER FOR JUSTICE
Attorneys for *Amici Curiae*
 Brennan Center for Justice; AARP;
 Center for Disability Rights; etc.
Brennan Center for Justice
 at NYU School of Law
161 Avenue of the Americas, 12th Floor
New York, New York 10013

PAUL K. SONN, ESQ.

NEAL P. McCURN, Senior U.S. District Judge

## MEMORANDUM-DECISION AND ORDER

### *Introduction*

Plaintiffs are a group of five health care organizations, whose members or affiliates provide a broad range of health care services, such as operating "220 acute care hospitals," "nearly 300 residential health care facilities," and providing services to individuals "with mental retardation and other developmental disabilities[.]"  Amended Complaint ("Co.") at 4, ¶¶ 6 and 8; and at 5 ¶ 9.

2

Plaintiffs are suing the Governor, the Attorney General and the Commissioner of Labor for the State of New York, seeking to overturn section 211-a of New York's Labor Law (hereinafter collectively referred to as "the State").

In a nutshell, that statute prohibits the use of "state funds," including Medicaid (which provides a substantial portion of the funding for plaintiffs), from "encourag[ing] or discourag[ing] union organization[.]" N.Y. LAB. LAW § 211-a (McKinney Supp. 2004).  Supporters of the law, such as the AFL-CIO, depict it as a "'union neutrality law[,]'" 66 BNA Daily Labor Report A-5, 2003, whereas plaintiffs describe it as an "'Employer Gag Law.'" Co. at 11, ¶ 28.

Given the chasm between labor and management with respect to the impact of § 211-a on labor relations in the workplace, it is not surprising that several groups moved to appear as *amicus curiae* in this action.  The court assumes familiarity with its May 27, 2004, decision granting *amicus* status to the Business Council; the Coalition and the Brennan Center.

### *Background*

In this declaratory judgment action, plaintiffs allege that the National Labor Relations Act ("NLRA") and the Labor Management Reporting and Disclosure Act ("LMRDA") preempt section 211-a.  Plaintiffs are also mounting several constitutional challenges to section 211-a, claiming that it violates their rights under the First and Fourteenth Amendments.

In its original form, section 211-a of the New York State Labor Law read as follows:

> Notwithstanding any other provision of law,
> no monies appropriated by the state for any purpose
> shall be used or made available to employers to train
> managers, supervisors or other administrative personnel

3

regarding methods to *discourage union organization.*

N.Y. LAB. LAW § 211-a (McKinney 2002) (emphasis added).  Effective December 29, 2002, the scope of that statute was greatly expanded.  Under the amended version of section 211-a, organizations that receive state funding, including Medicaid, are barred from using such monies to *either* encourage *or* discourage union organizing.  Prohibited activities include the hiring of attorneys or consultants or the training of managers or hiring employees "to encourage or discourage union organization, or to encourage or discourage an employee from participating in a union organizing drive[.]" Id. § 211-a(2) (McKinney Supp. 2004).  In addition, § 211-a contains detailed reporting requirements "sufficient to show that state funds were not used to pay for . . . activities [prohibited thereunder.]" Id. § 211-a(3).  The statute goes on to grant the State Attorney General enforcement powers in the form of seeking the "return of unlawfully expended funds[]" and the imposition of civil penalties.  See id. at § 211-a(4).  Finally, in its amended form § 211-a directs the State Labor Commissioner to, *inter alia*, promulgate regulations pertaining to the financial recordkeeping requirements thereunder.  See id. at § 211-a(5).

As noted at the outset, the parties have widely divergent views of section 211-a.  The plaintiff health care associations which allegedly are "either currently facing union organizing campaigns or reasonably expect to be subjected to [same] in the near future[,]" refer to it as the "'Employer Gag Law.'" Co. at 10, ¶ 23; and at 11, ¶ 28.  In their view section 211-a is nothing more than an "ill-conceived statute," which the State has enacted "[i]n its fervor to defeat employer opposition to union organization[.]" Pl. Memo. at 1.

Conversely the State refers to section 211-a as a "labor neutrality bill[,]"

4

which, according to Governor Pataki, "will protect taxpayers by ensuring that State tax dollars are used for their intended purpose, instead of being diverted to promote or discourage union organizing activities[.]" Co., exh. B thereto at 1. Despite being touted as labor "neutral," unions clearly view section 211-a as sending a pro-union message. In the Governor's press release announcing the amendment of section 211-a, the President of New York State's AFL-CIO proclaimed that that statute "'ensures that taxpayer dollars will not be used to interfere with a worker's constitutional right to join a union.'" Id. Another supporter of section 211-a claims that that statute will "'provide much needed protection for workers seeking to organize unions.'" Id.

### *Discussion*

### *I. Rule 12(c) Conversion*

There is one minor procedural issue which needs to be clarified. In its Notice of Motion, arguing that plaintiffs have failed to state a claim upon which relief may be granted, the State is moving for dismissal pursuant to Fed. R. Civ. P. 12(b)(6). Alternatively, in their opposition memorandum, in accordance with Fed. R. Civ. P. 12(c), the State is seeking to have its Rule 12(b)(6) motion converted to a motion for summary judgment. As alluded to during oral argument, the court views the preemption issues which these motions present as "predominately legal," and hence it sees no need to convert the State's motion to one for summary judgment. See Pac. Gas & Elec. v. St. Energy Resources Conserv., 461 U.S. 190, 201, 103 S.Ct. 1713, 1720 (1983). Consistent with the foregoing, in deciding plaintiffs' cross-motion for summary judgment the court will take into account only those documents which would be otherwise permissible in connection with a Rule 12(b)(6) motion.

## II.  Scope of Record

Clearly the court's decision to treat the State's motion as a Rule 12(b)(6) motion rather than a Rule 56 motion, limits the scope of the record herein. Included in the State's supporting papers is the affidavit of an attorney representing UNITE, a labor union which "organizes and represents employees employed by agencies which receive funding from" New York State.  Affidavit of Brent Garren (Dec. 17, 2003), at 1-2, ¶¶ 1 and 2.  Currently UNITE is involved in litigation before the National Labor Relations Board ("NLRB").  In that matter the employer, Independent Residences, Inc. ("IRI"), alleges "that the [union] election should be overturned because New York State Labor Law Sec. 211-A interfered with its ability to campaign against UNITE."  Id. at 2, ¶ 5.  Attached to the Garren affidavit are a number of documents pertaining to that NLRB matter.

During oral argument the court directed the State to provide a copy of the exceptions filed to the Administrative Law Judge's decision in IRI.  See Transcript (Sept. 13, 2004) ("Tr.") at 46.  It also directed the State to provide the court with a copy of the transcript of the argument.  Id. at 76.  The State complied, but in its post-argument submissions it included 20 additional documents which the court did *not* request.  Among those documents are newspaper articles, excerpts from several books and articles as well as the State Comptroller's 2003-04 Budget Analysis.  Plaintiffs and one of the *amici*, the Chamber of Commerce of the United States ("the Chamber"), objected to these additional documents being made a part of the record on these motions.  Thereafter, the court informed the parties that insofar as those objections were concerned, it would "advise the[m] . . . as to its determination in due course." Dkt. # 61.

Having had the opportunity to carefully consider the State's post-hearing

6

submissions and the objections to same as to whether such should be made a part of the record herein, the court sustains the objections to same.

## III. Preemption

The court will address NLRA preemption first. If the court finds that the NLRA preempts section 211-a, then there is no need to address the issue of LMRDA preemption, see Tr. at 62, and there would be no need to address the constitutionality of that statute. See Piazza's Seafood World, LLC v. Odom, No. Civ.A. 04-690, 2004 WL 1375306, at *4 (E.D.L.A. June 17, 2004) ("In light of the Court's finding that federal law preempts [a Louisiana State statute,] the constitutional challenges are now moot and need not be decided."); see also Greater NY Metropolitan Food Council v. Giuliani, 195 F.3d 100, 110 (2d Cir. 1999).

### A. Generally

Preemption has its origins in the Supremacy Clause of the United States Constitution, which provides in pertinent part that "the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land[.]" U.S. Const. Art. VI, cl. 2. "Although not a source of a federal right by itself, th[is] . . . Clause secure[s] federal rights by according them priority whenever they come in conflict with state law." Rondout Electric, Inc. v. NYS Dept. of Labor, 335 F.3d 162, 166 (2d Cir. 2003), cert. denied, 540 U.S. 1105 (2004) (internal quotation marks and citations omitted).

Preemption can be either explicit or implicit. "State law is preempted explicitly where Congress states an intent to occupy a field and to exclude state regulation." Id. Implicit preemption results "where the federal interest in the subject matter regulated is so pervasive that no room remains for state action,

indicating an implicit intent to occupy the field, or where the state regulation at issue conflicts with federal law or stands as an obstacle to the accomplishment of its objectives." Id. (citing, *inter alia*, Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 203-04 (1983)). "Preemption, whether express or implied, may partially, as well as totally, displace state law." Drake v. Laboratory Corporation of America Holdings, 290 F.Supp.2d 352, 364 (E.D.N.Y. 2003).

### *B. NLRA*[1]

The NLRA, 29 U.S.C. §§ 151-169 (2002), which governs labor-management relations in the private sector, contains no express pre-emption provision. Bldg. & Const. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc., 507 U.S. 218, 224, 113 S.Ct. 1190, 1194 (1983)) ("Boston Harbor"). Nonetheless in 1986 the Supreme Court declared, "It is by now a commonplace that in passing the NLRA Congress largely displaced state regulation of industrial relations." Wisconsin Dept. of Industry v. Gould Inc., 475 U.S. 282, 286, 106 S.Ct. 1057 (1986)). This is consistent with the presumption under the Supremacy Clause "in favor of preemption in fields that are inherently federal in character and that the states have not traditionally

---

[1]    The State accurately points out that the NLRA's definition of "employer" excludes "any State or political subdivision thereof." 29 U.S.C. § 152(2). According to the State, "[t]he NLRA does not . . . govern many employers represented by the plaintiffs, which include 'public . . . health care providers' and agencies 'owned and operated by . . . the State of New York and by county and municipal governments.'" State Memo. at 14, n. 12 (quoting Co. at ¶¶ 6 and 7). The State is overlooking the allegations in the complaint that all of the plaintiff organizations' members "*are employers* within the meaning of Labor Law § 211-a[]" -- allegations which the State is not disputing in any meaningful way. See Co. at 4-5, ¶¶ 6-9 (emphasis added). Therefore, the court gives no credence to the State's argument that "even if § 211-a were preempted with respect to those employers which are covered by the NLRA, the statute itself could not be declared preempted." St. Memo. at 14, n. 12.

occupied." <u>Drake</u>, 290 F.Supp.2d at 363-64 (citing <u>Buckman Co. v. Plts' Legal Comm.</u>, 513 U.S. 341, 347 (2001)).   Two distinct lines of preemption jurisprudence have emerged under the NLRA.  At this juncture only a brief outline of the two strands of NLRA preemption is necessary.

### *1.  Garmon Preemption*

The first line of NLRA preemption, <u>Garmon</u> preemption, "developed from a line of cases that focused on the primary jurisdiction of the NLRB."  <u>New England Health Care, Employees Union, District 1199, SEIA/AFL–CIO v. Rowland</u>, 221 F.Supp.2d 297, 324 (D.Conn. 2002) (citation omitted).  It "corresponds to the 'actual conflict category of general preemption theory[.]'"  <u>Aeroground, Inc. v. City and County of San Francisco</u>, 170 F.Supp.2d 950, 955 (N.D.Cal. 2001) (citation omitted).  "Sections 7[2] and 8[3] of the [NRLA] regulate 'concerted

---

[2]        Section 7 of the NLRA enumerates the "[r]ight of employees as to organization, collective bargaining, etc."  29 U.S.C. § 157 (West 1998).  It reads as follows:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title"

<u>Id.</u>

[3]        Section eight of the NLRA provides:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

activities' and 'unfair labor practices,' respectively, seeking to protect the former and stamp out the latter." Building Trades Employers' Ass'n v. McGowan, 311 F.3d 501, 508 (2d Cir. 2002) (citing 29 U.S.C. §§ 157, 158 (codifying § 7 and § 8 of the NLRA)) (footnotes added). "'Garmon pre-emption,' . . . forbids state and local regulation of activities that are 'protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8." Boston Harbor, 507 U.S. at 224, 113 S.Ct. at 1194 (internal quotation marks and citations omitted). Garmon pre-emption is relatively broad in that it "prohibits regulation even of activities that the NLRA only *arguably* protects or prohibits." Id. (citation omitted). The purpose of Garmon pre-emption is "to prevent conflict between, on the one hand, state and local regulation and, on the other, Congress' integrated scheme of regulation, . . . embodied in §§ 7 and 8 of the NLRA, which includes the choice of the NLRB, rather than state or federal courts, as the appropriate body to implement the Act." Id. at 225, 113 S.Ct. at 1194-95 (internal quotation marks and citations omitted).

### 2.  *Machinists Preemption I*

The second line of NLRA pre-emption is known as Machinists pre-emption after the case of the same name. See Machinists v. Wisconsin Employment Relations Comm'n, 427 U.S. 132, 96 S.Ct. 2548 (1976). Machinists preemption is "analogous to the theory of field preemption," Aeroground, 170 F.Supp.2d at 955 (citation omitted), and "prohibits state and municipal regulation of areas that have been left to be controlled by the free play of economic forces." Boston Harbor, 507 U.S. at 225-26, 113 S.Ct. at 1195 (internal quotation marks and

---

29 U.S.C. § 158(c) (West 1998).

citations omitted).  <u>Machinists</u> preemption "protects against interference with policies implicated by the state of the [NLRA] itself, by preempting state law and state causes of action concerning conduct that Congress intended to be unregulated." <u>Metro. Life Ins. Co. v. Massachusetts</u>, 471 U.S. 724, 749, 105 S.Ct. 2380, 2394 (1985).  In other words, "states may not 'deny[] one party to an economic contest a weapon that congress meant him to have available.'" <u>District 1199</u>, 221 F.Supp.2d at 324 (quoting <u>Machinists</u>, 427 U.S. at 150, 96 S.Ct. at 2558 (other quotation marks omitted)).  "Courts have generally held that <u>Machinists</u> preemption protects against the unsettling of the 'balance of interests established in the NLRA.'" <u>Alcantara v. Allied Properties, LLC</u>, 334 F.Supp.2d 336, 341 (E.D.N.Y. 2004) (quoting <u>McGowan</u>, 311 F.3d at 508) (other citation omitted).

The underlying rationale for <u>Machinists</u> preemption is that it "preserves Congress' intentional balance between the uncontrolled power of management and labor to further their respective interests."  <u>Boston Harbor</u>, 507 U.S. at 226, 113 S.Ct. at 1195 (internal quotation marks and citation omitted).  "In the design and enactment of th[e] [NLRA], Congress assumed that employers and unions would engage in economic self-help to the extent that such conduct is not expressly prohibited [under that Act.]" <u>McGowan</u>, 311 F.3d at 509 (citation omitted).

Before addressing either or both of these preemption doctrines, however, it is necessary to consider whether section 211-a is sheltered from such preemption analysis because it comes within the market participant exception to same.

### a.  *Market Participant Exception*

In <u>Boston Harbor</u> the Supreme Court fashioned what has come to be known as the "market participant exception" to <u>Garmon</u> and <u>Machinists</u> preemption.  This exception requires courts to distinguish "between government as *regulator* and

11

government as *proprietor*[]" when deciding whether the NLRA preempts a given local statute, regulation or action. See Boston Harbor, 507 U.S. at 227, 113 S.Ct. at 1196 (emphasis added). Making this distinction is critical because "[t]he NLRA does not preempt actions taken by a state when it . . . acts as a mere proprietor or market participant." Chamber of Commerce v. Lockyer, 364 F.3d 1154, 1161 (9th Cir. 2004) (internal quotation marks and citations omitted). The underlying basis for the Boston Harbor exception is the concept that "the NLRA was intended to supplant state labor regulation, [but] not all legitimate state activity that affects labor," and that "[p]ermitting the States to participate freely in the marketplace is consistent with NLRA pre-emption principles." Boston Harbor, 507 U.S. at 227 and 230, 113 S.Ct. at 1197. "As the [Supreme] Court explained, if a *state* is *acting* just as a *private contractor* would act, and, in doing business with other parties, places labor conditions on those parties in a manner that a private contractor lawfully could, then the state is *not regulating* the workings of the market." Stephen F. Befort, Bryan N. Smith, *At the Cutting Edge of Labor Law Preemption: A Critique of Chamber of Commerce v. Lockyer.* 20 LAB. LAW 107, 115 (Summer, 2004) (emphasis added).

Moreover, "[a] State does not regulate, . . . simply by acting within one of these protected areas [*i.e.*, market freedom or NLRB jurisdiction.] When a State owns and manages property, for example, it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation*." Boston Harbor, 507 U.S. at 226-27, 113 S.Ct. at 1196 (emphasis added by Boston Harbor Court).

The State contends that it is acting as a market participant under section

12

211-a, and thus the NLRA does not preempt that statute. According to the State it is a market participant because, for example, through the Medicaid program, it is "not regulat[ing] health care - as through a licensing statute, or rules governing health care providers' relationship with patients – but [it is] buy[ing] services for low-income consumers much as an insurer or an employer providing employee benefits might buy health services." State Memo. at 20-21. As further support for its position, the State notes that under section 211-a it is "not regulat[ing] the activity in which the Complaint alleges that plaintiffs wish to engage, 'to communicate with their employees about the advantages and disadvantages of unionization (Par. 44) – or, for that matter, any other activity." Id. at 15. Further, contends the State, its "[m]ere refusal to fund" what it characterizes as "the narrowly limited activities to which § 211-a applies – a refusal [which] applie[s] equally whether employers are pro- or anti-union, and leaving them free to engage in even these narrow activities with non-state funds – is not 'regulating.'" Memorandum of Law in Opposition to Plaintiffs' Cross-Motion for Summary Judgment and Reply Memorandum of Law in Support of Defendants' Motion to Dismiss at 3.

The Brennan Center *amicus,* which is aligned with the State in this litigation, takes a slightly different tack focusing on what it views as the State's permissible restriction on the use of its own funds. The Center argues that because "the restriction here is limited to the contractual relationship – *i.e.,* it applies only to the use of *state* funds[,]" that "condition is proprietary." Brief of *Amici Curiae* Brennan Center for Justice ("Brennan Memo") at 16 (footnotes omitted). Further, the Brennan Center views section 211-a as an important tool to maintain accounting procedures and to ensure the proper use of scarce public funds.

13

Finally, the Brennan Center contends that § 211-a serves a "compelling state interest" by "ensur[ing] that scarce state resources are used for their intended purpose of delivering urgently needed care to needy New Yorkers." Id. at 3 and 2.

Conversely, plaintiffs assert that under § 211-a the State is regulating in that it is "curtail[ing] an employers' ability to exercise the economic weapon of hiring consultants or attorneys to encourage or discourage unionization or effectively communicating the advantages or disadvantages of unionization." Pl. Memo. at 8. Plaintiffs further reason that "section 211-a is not a restriction on state spending[]" because "[i]t has no effect upon what goods or services are purchased by the State, nor how much the State pays for those goods and services." Id. at 3-4. Plaintiffs continue: Section 211-a "only regulates how much money private employers can spend on purely private activities." Id. at 4.

The Chamber, as *amicus*, enumerates four reasons as to why section 211-a is regulatory, and thus subject to NLRA preemption. First the Chamber contends that the "proper focus" here is on "the conduct being regulated by the state[.]" Chamber Memo. at 9. And, in the Chamber's opinion, that conduct "is an employer's ability to express its views, arguments and opinions regarding union organization by prohibiting the use of state funds by employers to train its management and administrative staff on the 'do's [sic] and don't's' [sic] of union organization campaigns, hiring attorneys, consultants or other contractors for legal and other advice, and hiring employees whose "principal job duties are to encourage or discourage union organization.'" Id. (quoting LAB. LAW § 211-a(2)) (footnote omitted).

Second, from the Chamber's perspective "§ 211-a does not address any employer conduct related to the performance of its duties." Id. (citations omitted).

14

To further support its argument that section 211-a is regulatory as opposed to proprietary, the Chamber notes the "broad application" of that statute in that it "applies to all state contracts, regardless of amount[.]" Id. at 10.  Last, the Chamber opines that as a result of section 211-a "any employer wishing to do, or to continue to do, business with the state will 'think twice' before opposing any organizational campaigns."  Id. at 11 (citation omitted).

The Coalition, as an *amicus* which also supports the plaintiff's view of section 211-1, points out that Congress has a "clear interest" in encouraging employer free speech in the area of labor relations[.]" Amicus Curiae Brief in Opposition to Motion to Dismiss and in Support of Plaintiffs' Motion for Summary Judgment ("Coalition Memo.") at 6.  According to the Coalition, section 211-a establishes a "contrary policy" by supposedly favoring employer "neutrality" regarding unionization.  Id. at 7.  In the Coalition's view, this results in the State impermissibly "substitut[ing] its own policy for the federal labor policy established in the NLRA[.]" Id.

As the foregoing makes clear, the first preemption issue is whether section 211-a is proprietary or regulatory.  Resolution of this issue is essential to the court's preemption analysis because if the court finds that under that statute the State is acting as a proprietor, rather than a regulator, then there will be no need to address the issue of whether section 211-a "runs afoul of the principles established in Garmon and Machinists[.]" Building and Construction Trades Department, AFL-CIO v. Allbaugh, 295 F.3d 28, 34 (D.C. Cir. 2002).  If, on the other hand, the court deems section 211-a to be regulatory, it will be "necessary to determine the applicability of Garmon . . . and Machinists preemption to the present set of facts and circumstances."  See Hudson County Building and Construction Trades

15

Council, AFL-CIO, 960 F.Supp. 823, 833 (D.N.J. 1996).

### *I. Cardinal Towing v. Sage Hospitality*

The Fifth Circuit in Cardinal Towing & Auto Repair, Inc. v. City of
Bedford, 180 F.3d 686 (5th Cir. 1999), adopted a two-part test to decide the
applicability of the Boston Harbor market participant exception:

> First, does the challenged action essentially
> reflect the entity's own interest in its efficient
> procurement of needed goods and services, *as
> measured by comparison with the typical behavior
> of private parties in similar circumstances*?  Second,
> does the narrow scope of the challenged action defeat
> an inference that its primary goal was to encourage a
> general policy rather than address a specific proprietary
> problem?

Id. at 693 (emphasis added).  The purpose of this inquiry is "to isolate a class of
government interactions with the market that are so narrowly focused, and so in
keeping with the ordinary behavior of private parties, that a regulatory impulse can
be safely ruled out."  Id.  "Both prongs are methods of determining whether the
state action at issue in fact constitutes regulation."  Lockyer, 364 F.3d at 1163.

During oral argument, when specifically asked about the applicability of the
Cardinal Towing test, the State responded that "basically" that is the "proper test"
for the court to apply here.  See Tr. at 52.  At that time the Ninth Circuit in
Lockyer, in a case addressing the issue of whether a statute similar to section 211-
a fell within the market participant exception to NLRA preemption, "drew upon
the reasoning" of the Fifth Circuit's test in Cardinal Towing test.  See Lockyer,
364 F.3d at 1162-63.  Further, although the issue in Sprint Spectrum L.P. v. Mills,
283 F.3d 404 (2d Cir. 2002), was preemption under the Telecommunication Act,

the Second Circuit cited <u>Cardinal Towing</u> with approval. <u>Id.</u> at 420; <u>see also</u>
<u>Rowland</u>, <u>supra</u>, 221 F.Supp.2d at 326-28 (applying <u>Cardinal Towing</u> "standard
for distinguishing" whether a state's payment of Medicaid subsidies to nursing
homes conflicted with the NRLA rights of union members).

Since oral argument, however, two decisions have been issued --
<u>Metropolitan Milwaukee Association of Commerce v. Milwaukee County</u>, 359
F.Supp.3d 749 (E.D. Wis. 2005) ("<u>MMAC</u>"); and <u>Hotel Employees & Restaurant</u>
<u>Employees Union, Local 57 v. Sage Hospitality Resources, LLC</u>, 390 F.3d 206 (3rd
Cir. 2004), <u>cert. denied</u>, 2005 WL 585248, 73 USLW 3557 (April 25, 2005) --
which the parties contend cast doubt as to how to define the first factor to be used
in deciding whether section 211-a is regulatory or proprietary. In <u>Sage Hospitality</u>
the Third Circuit articulated the first of its two-step analysis as follows: "First,
does the challenged funding condition serve to advance or preserve the state's
proprietary interest in a project or transaction, as an investor, owner, or financier?
390 F.3d at 216 (citation omitted).[4]  Unlike <u>Cardinal Towing</u>, among other things,
absent from this inquiry is any suggestion that courts should consider the
government's actions "as measured by comparison with the typical behavior of
private parties in similar circumstances[.]" <u>See</u> <u>Cardinal Towing</u>, 180 F.3d at 693.

Applying the Third Circuit <u>Sage Hospitality</u> test, the district court in
<u>MMAC</u> held that in "determin[ing] whether the government has advanced a

---

[4]      The second factor identified by the <u>Sage Hospitality</u> Court is substantially similar
to the second prong in <u>Cardinal Towing</u>: "[I]s the scope of the funding condition specifically
tailored to the proprietary interest?" 390 F.3d at 216 (citation omitted). And the parties do not
contend that there is any difference between the second factor as enumerated by the <u>Cardinal</u>
<u>Towing</u> and <u>Sage Hospitality</u> Courts. Given this agreement, there is no need to consider the
nature of the second <u>Cardinal Towing</u> factor.

17

proprietary justification for its action[,] . . . the government is *not* required to prove that the action in question is typical of the actions of private entities." MMAC, 359 F.Supp.2d at 759 (emphasis added) (footnote omitted). Instead, the Court there held that the government "need only show that it has a reasonable basis for concluding that the challenged action will serve its proprietary interest." Id. This view finds support in Sage Hospitality wherein the Third Circuit opined, *inter alia*, that it did not read "Boston Harbor and its progeny [as] requir[ing] . . . a survey of what private parties do in like circumstances." 390 F.3d at 216 n. 7 (citation omitted).

In the present case plaintiffs contend that the Sage Hospitality test, which the MMAC court employed, is "significantly different" than the Cardinal Towing test. Letter from James A. Shannon to Court of 3/28/05, at 2. From plaintiffs' standpoint, the "important difference is while the [Cardinal Towing] test . . . . reviewed the interest of the government's action as measured by comparison with the typical behavior of private parties in similar circumstances, . . . , the court in MMAC specifically held that the government is not required to prove that the action in question is typical of the actions of private entities." Id. (internal quotation marks and citations omitted).

The court agrees with the State's response that there is no "significant[] difference" between the two tests. Letter from Seth Kupferberg to Court of 3/30/05, at 1. The contrast between the Cardinal Towing and Sage Hospitality is not as stark as it might appear at first glance. First, although the Courts in Cardinal Towing and Lockyer recited the "comparison to a private party" language, neither actually applied it. Second, despite plaintiffs' assertion to the contrary, nothing in Cardinal Towing *mandates* that the government prove that its

18

conduct is "typical behavior of private parties in similar circumstances[.]" See
Cardinal Towing, 180 F.3d at 693. To be sure, the Fifth Circuit in Cardinal
Towing opined that the purpose of the two-step inquiry "is to isolate a class of
government interactions with the market [is] so narrowly focused, and so in
keeping with the ordinary behavior of private parties, that a regulatory impulse can
be safely ruled out[.]" Id. That is *not* the same, however, as requiring the
government "to *prove* that the action in question is typical of the actions of private
entities." See MMAC, 359 F.Supp.2d at 759 (footnote omitted) (emphasis added).

Especially persuasive in this regard is the court's reasoning in MMAC.
There the court acknowledged that "[a]lthough a government's showing that its
action is typical of the actions of similarly situated private entities would be strong
evidence that its action is proprietary, it is unlikely that Congress intended to
require state . . . governments to make such a showing." Id. at 759, n. 9. As the
MMAC court soundly reasoned, such a showing is not required "because state and
local governments often act in areas [and on a scale] that private parties do not."
Id. Such is the case here. As in MMAC, "it would probably be impossible for
[the State] to find a similarly situated private entity and therefore to show that its
action is typical of the actions of such entities." Id.

An additional reason for not requiring the State in the present case to show
that its actions are typical of a similarly situated private party is that "even where
there are private parties in the same position as the [State,] requiring the [State] to
show that its action is typical of those parties would prevent it from devising
innovative solutions to its proprietary problems." Id. For all of these reasons,
this court will rely upon the Cardinal Towing framework to determine whether
section 211-a is regulatory or proprietary, and it will not require the State to prove

19

that its conduct is "typical of similarly situated private entities." The court hastens to add that simply because a comparison to the typical behavior of a private parties may not be particularly helpful here, that does not mean that such a comparison will never be relevant or useful in deciding whether a governmental entity is entitled to invoke the market participant exception.

Addressing the Cardinal Towing factors in reverse order, the court finds that the scope of section 211-a is not sufficiently narrow to overcome the "inference that its primary goal was to encourage a general policy rather than address a specific problem." See Cardinal Towing, 180 F.3d at 693. Given the similarity between that statute and the California statute at issue in Lockyer, the Ninth Circuit's decision therein is particularly instructive. Like section 211-a, the challenged statute in Lockyer forbade "'recipient[s] of a grant of state funds' from 'us[ing] the funds to assist, promote, or deter union organizing.'" 364 F.3d at 1159. In a similar vein, that statute also "bar[red] '[a] private employer receiving state funds in excess of [$10,000] in any calendar year on account of its participation in a state program' from using such funds 'to assist, promote, or deter union organizing.'" Id.

In finding that that California statute did not "have a narrow scope or any other element that would indicate that [it] is unrelated to broader social regulation[,]" the Ninth Circuit relied upon several factors. First of all, it pointed out that that statute "applie[d] to *all employers* in California who accept any state grant or funding in excess of $10,000." Id. at 1163 (citation omitted) (emphasis added). Second, the Court noted that the statute "impose[d] separate accounting requirements on any business that accepts a state grant or enters into a contract with the state for more than $10,000." Id. (citation omitted). Third, the Lockyer

20

Court observed that the statute "contain[ed] a provision for civil penalties and permit[ted] private parties to file civil actions against employers who violate [it]." Id. (citations omitted). In light of the foregoing the Ninth Circuit found that the California statute "indicates a general state position, *not a narrow attempt to achieve a specific goal.*" Lockyer, 364 F.3d at 1163 (emphasis added).

The same is true here. Section 211-a does not address a specific proprietary problem. Section 211-a is broadly drafted to apply to *all State contracts, regardless* of amount. In sweeping language, section 211-a(2) provides:

> Notwithstanding any other provision of law,
> no monies appropriated by the state *for any purpose* shall be made available to employers to:
> (a) train managers, supervisors or other administrative
> personnel regarding methods to encourage or discourage
> union organization, or to encourage or discourage an
> employee from participating in a union organization
> drive; (b) hire or pay attorneys, consultants or other
> contractors to encourage or discourage union organization,
> or to encourage or discourage an employee from
> participating in a union organizing drive; or (c) hire
> employees or pay the salary and other compensation of
> employees whose principal job duties are to encourage or
> discourage union organization, or to encourage or discourage
> an employee from participating in a union organizing drive.

N.Y. LAB. LAW § 211-a(2) (emphasis added). In this respect section 211-a is even broader in scope than the Lockyer statute, which was not implicated unless the state funds were in excess of $10,000.00. Here, there is no monetary floor.

Section 211-a stands in sharp contrast to those cases such as Boston Harbor wherein courts have found that a government's actions were "purely proprietary" because those actions related to specific projects. See Boston Harbor, 507 U.S. at

231, 113 S.Ct. at 1198.  For example, in <u>Boston Harbor</u> a state agency had been court-ordered to complete the construction of treatment facilities as part of the Boston Harbor clean-up.  "To prevent time-consuming work stoppages, the agency agreed to employ a union workforce in exchange for a no-strike guarantee." <u>Cardinal Towing</u>, 180 F.3d at 692.

In finding that the state agency's actions were not "tantamount to regulation[,]" and thus not subject to NLRA preemption, the Supreme Court found several factors significant. <u>Boston Harbor</u>, 507 U.S. at 229, 113 S.Ct. at 1197 (internal quotation marks and citation omitted).  Among those was the fact that the agency's action was an attempt "to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost[.]" <u>Id.</u> at 232, 113 S.Ct. at 1198.  The Court also found significant the fact that after completion, the state agency would own and manage the treatment facilities – clearly a proprietary undertaking.  Other cases where courts have found a government's actions to be proprietary involved a specific project or narrow proprietary goal, both of which are missing in the present case. <u>See</u>, <u>e.g.</u>, <u>Sage Hospitality</u>, 390 F.3d at 218 (city ordinance "condition[ing] a grant of tax increment financing upon . . . acceptance of a labor neutrality agreement[]" was a "specifically tailored response to a financial interest, given the income [to the city] expected from the development [of a hotel construction project"]); <u>Sprint,</u> 283 F.3d at 420-21 (quotation marks and citation omitted) (requirement in school district *single lease* with respect to a *single building* that provider of wireless communication services certify that it was in compliance with . . . FCC regulations was "plainly proprietary"); <u>Cardinal Towing</u>, 180 F.3d at 689 and 694 (citation omitted) (city's decision to award single towing  contract was proprietary and thus exempt from

22

preemption under the federal motor carrier act).

Furthermore, in language nearly identical to the Lockyer statute, section 211-a mandates the maintenance and retention of certain financial records "sufficient to show that state funds were not used to pay for . . . activities [to encourage or discourage union organization]." N.Y. LAB. LAW § 211-a(3). Also as in Lockyer, section 211-a contains a provision for civil penalties; and although it does not allow for private party enforcement suits, as the Lockyer statute does, section 211-a authorizes suits by the attorney general to ensure compliance with this statute. See id. at § 211-a(4). Given the striking similarity between section 211-a and the Lockyer statute, this court finds that section 211-a is "designed to have a broad social impact, by altering the ability of a wide range of recipients of state money to advocate about union issues." Lockyer, 364 F.3d at 1163 (footnote omitted) (emphasis added).

Section 211-a "by its design sweeps broadly to shape policy in the overall labor market." Id. In fact, as the Brennan Center acknowledges, section 211-a is like other state statutes [and regulation] "[s]pending prohibitions[,] . . . [which] play an important role in the long-standing and *extensive regulatory system* aimed at ensuring that funds are used for designated purposes and not diverted for unauthorized purposes." Brennan Memo. at 8 (emphasis added). Thus, section 211-a is but one, "*important part* of the *state's system* for safeguarding the public fisc." Id. at 2 (emphasis added).

Consistent with the concept of protecting its purse, relying upon Allbaugh, 295 F.3d 28, the State contends that "when it acts," as it claims to be doing under section 211-a, "to ensure the most effective use of those funds, it is acting in a proprietary capacity." Id. at 35; see also Tr. at 32. It is not that simple though. A

23

state cannot assert that it is a proprietor just by relying upon a general statement, which section 211-a contains, that its "proprietary interests" will be "adversely affected" by certain expenditures.  See N.Y. LAB. LAW § 211-a(1).  As the court astutely observed in Aeroground,"simply addressing the financial interests of a public entity does not make such efforts those of a market participant.  If that were the case, then every effort by a government entity to increase its revenues could be characterized as market participation."  170 F.Supp.2d at 958; cf. Sage Hospitality, 390 F.3d at 216 ("If we treated a public agency's bare interest in maximizing tax revenue as a proprietary interest, then preemption analysis would not apply to any state rule arguably designed to curtail labor strife that threatens to reduce corporate profits and, therefore, tax receipts.  Expanding the concept of market participation to embrace so broad a concept of proprietary interest  would render preemption law in this area a nullity.") In short, given its blanket application, unrelated to a specific goal, under the second prong of the Cardinal Towing test, section 211-a is regulatory in nature.  That does not end the court's inquiry, however.

Whether the first Cardinal Towing factor supports a regulatory finding is a closer call.  As discussed above, in applying the first Cardinal Towing factor to the present case, the court will focus on whether section 211-a "essentially reflect's the [State's] own interest in its efficient procurement of needed goods and services[.]" See Cardinal Towing, 180 F.3d at 693.  Because "the statute's preamble [in Lockyer] ma[d]e clear that the legislative purpose [wa]s not procurement, but preventing the state from influencing employee choice about whether to join a union[,]" it is easy to see how that statute  "on its face d[id] not purport to reflect California's interest in the efficient procurement of goods and

24

services[.]" <u>Lockyer</u>, 364 F.3d at 1163 (citation omitted). In <u>Lockyer</u>, the State's role as a regulator, as opposed to a proprietor, was reinforced by this explicit policy statement: "It is the policy of the state not to interfere with an employee's choice about whether to join or to be represented by a labor union." <u>Id.</u> (citation omitted). The legislature continued, "*For this reason*, the state should not subsidize efforts by an employer to assist, promote, or deter union organizing." <u>Id.</u> (internal quotation marks and citation omitted) (emphasis added by <u>Lockyer</u> Court). Obviously these statements of legislative purpose lent significant credence to the view that the <u>Lockyer</u> statute was regulatory.

In contrast, the Legislative Memorandum addressing the amendment of section 211-a explicitly sets forth a proprietary, not a regulatory, purpose. It declares that "[s]ection one of the bill amends [that statute] to establish a legislative finding regarding the *proprietary interest* of the state in ensuring that scarce public resources are utilized solely for the public purpose for which they were appropriated[.]" 2002 NY LEGIS. LAWS MEMO CH. 601 (emphasis added). [cite form for session laws) This "legislative finding" is specifically incorporated in section 211-a itself. Subsection one of that statute states: "The legislature finds and declares that when public funds are appropriated for the purchase of specific goods and/or the provision of needed services, and those funds are instead used to encourage or discourage union organization, the *proprietary interests* of this state are adversely affected." N.Y. LAB. LAW § 211-a(1) (emphasis added). The State's claimed "proprietary interest" is echoed again in the "Justification" section of the Legislative Memorandum, wherein it reiterates that "[i]t is *clearly* in the *proprietary interests* of the *state* to ensure that the public funds are not misdirected." 2002 NY LEGIS. LAWS MEMO CH. 601 (emphasis added).

As alluded to in the preceding discussion of the scope of section 211-a, however, mere recitation of a proprietary purpose is not, in this court's opinion, sufficient to overcome the regulatory impact of a given governmental action. This is in keeping with the view that "courts have gauged the extent of preemption by the *objective effects* of the challenged state action, looking to see whether the action functions to promote a particular labor policy in general or else to serve legitimate proprietary needs within a more discrete setting." The Legal Aid Society v. City of New York, 114 F.Supp.2d 204, 237-38 (S.D. 2000) (citations omitted). And here, despite the proprietary language of section 211-a and its legislative purpose, section 211-a falls closer to the regulatory end of the continuum than it does to the proprietary end.

Section 211-a is more regulatory in nature because unlike the 'purely proprietary' interests of the defendants in Boston Harbor, here, the State "acted within a regulatory scheme that focused on ensuring the health . . . of the public [fisc,] not on regulating the bargaining relationship between labor and management." See Rowland, 221 F.Supp.2d at 328. "Yet," as in Rowland, "th[is] regulatory scheme, . . . had a clearly discernible impact on the labor-management relationship[]" in that despite its facially neutral language, section 211-a effects the policy of neutrality in the labor arena. It does this by in essence allowing unions to actively participate in union organization campaigns, while at the same time significantly curtailing the ability of employers to voice their opposition to unions. Moreover, unlike Boston Harbor, where the agency's action was an attempt "to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost[,]" similar proprietary interests are conspicuously absent from section 211-a. See Boston Harbor, 507 U.S. at 232,

113 S.Ct. at 11.  Accordingly, the court finds that the first <u>Cardinal Towing</u> criteria also supports a finding that the State is acting as a regulator under section 211-a.

In light of the foregoing, the next consideration is whether, nonetheless, the NLRA preempts section 211-a.  NLRA preemption is the next step in this analysis because even though the court has deemed section 211-a to be regulatory, that "does not mean that [it is] automatically preempted by the NLRA." <u>See</u> <u>Lockyer</u>, 364 F.3d at 1163; <u>see also</u> <u>Sage Hospitality</u>, 390 F.3d at 213 (internal quotation marks and citations omitted) ("[A]fter <u>Boston Harbor</u>, preemption analysis only comes into play when the state's activity in question constitutes regulation.")

### 3. *Machinists Preemption II*

"<u>Machinists</u> preemption is grounded in what Congress intended to be unregulated, and courts decide which areas Congress may have intended to be left to market forces." <u>Alcantra v. Allied Properties, LLC</u>, 334 F.Supp.2d 336, 344 (E.D.N.Y. 2004) (internal quotation marks and citation omitted).  As Judge Weinstein so aptly stated in <u>Alcantra</u>, "[d]eciding on preemption is an inexact art." <u>Id.</u>  The present case exemplifies this inexactness.

In addition to the general <u>Machinists</u> preemption principles set forth earlier, there are several other such principles which factor into the court's analysis here. The first is that "not all state action that affects the labor-management relationship would 'frustrate the effective implementation of the policies of the [NLRA].'" <u>Rowland</u>, 221 F.Supp.2d at 328 (quoting <u>New York Tel. Co. v. New York St. Dept. of Labor</u>, 440 U.S. 519, 531, 99 S.Ct. 1328, 1336 (1979) (plurality opinion)).  Rather, the Second Circuit has declared that "state action is only preempted if it regulates the use of economic weapons that are recognized and protected under the NLRA such that the . . . government has entered 'into the

27

substantive aspects of the bargaining process to an extent Congress has not countenanced.'" Rondout, 335 F.3d at 161 (quoting Machinists, 427 U.S. at 149).

By the same token, "'[t]o violate Machinists, . . . the state regulation at issue must do more than incidentally affect the union organizing process.'" Alcantra, 334 F.Supp.2d at 342 (quoting Lockyer, 364 F.3d at 1167). "The Supreme Court has consistently distinguished between state laws of general applicability (such as regulation of labor conditions), which generally are not preempted by the NLRA, and *state regulation* of the NLRA *process itself*, which generally is *preempted*.'" Id. (quoting Lockyer, 364 F.3d at 1167) (emphasis added). To illustrate, the Lockyer Court noted that "state regulation of minimum labor conditions is generally not preempted." Lockyer, 364 F.3d at 1166-67 (citations omitted). Likewise, normally the NLRA does not "preempt ordinary state contract law of general applicability." Id. (citation and footnote omitted).

The Lockyer Court recognized, however, that there is a fundamental difference between the foregoing situations and a situation where "the state regulation directly targets a process that is central to the union organizing and collective bargaining  system established by the NLRA." Id. at 1167. Further, the Lockyer Court reasoned, "[t]his is true regardless of whether the direct state regulation is designed to benefit employers, employees or even the public at large." Id. Emphasizing function over form, the Lockyer Court stressed the "importan[ce]" of a "state's ability to control the use of its funds[.]" Id. Nonetheless the Court found that "regulation that specifically targets and substantially affects the NLRA bargaining process will be preempted, even if such regulation comes in the form of a restriction on the use of state funds." Id.

Plaintiffs are taking the position that "[s]ection 211-a is preempted under . .

28

. <u>Machinists</u> . . . because it curtails an employer's ability to exercise the economic weapons of hiring a consultant or attorney to encourage or discourage unionization or effectively communicating the advantages or disadvantages of unionization." Pl. Memo. at 9. Section 211-a hampers the NLRA bargaining process, argue the plaintiffs, by "imped[ing] the flow to employees of information," such as "the possible disadvantages of unionization that an employer might want to convey[.]" <u>Id.</u> at 10. Thus, in plaintiffs' view section 211-a "[w]ork[s] at cross-purposes" with the NLRA by prohibiting employers from conveying such information. See <u>id.</u> As the Coalition more succinctly puts it, "§ 211-a is preempted by the NLRA because it regulates employer speech that Congress intended to leave free from regulation." Coalition Memo. at 11.

The Chamber echoes plaintiffs' arguments, contending that section 211-a is preempted under <u>Machinists</u> because it "attempt[s] to regulate an employer's ability to engage in noncoercive speech to express its views, argument  and opinions in opposition to union organization – 'conduct that Congress aimed to be unregulated in furtherance of policies implicated by the [Act] itself.'" Brief of *Amici Curiae* Chamber of Commerce of the United States of America, *et al.* at 13 (quoting, *inter alia*, <u>McGowan</u>, 311 F.3d at 509). Basically it is the position of plaintiffs and their *amici* that section "211-a constitutes 'government interference with [an] economic weapon[]' that 'upset[s] the delicate balance of interests established in the NLRA,' <u>McGowan</u>, 311F.3d at 509,' and hence "it is preempted under <u>Machinists</u>." <u>Id.</u> at 13-14; <u>see also</u> Coalition Memo. at 11 (Section "211-a is preempted by the NLRA because it regulates employer speech that congress intended to leave free from regulation.")

The State responds that the forms of "non-coercive employer

29

communication[,]" such as "employers' training of managers and hiring of consultants or special employees 'to communicate with their employees about the advantages and disadvantages of unionization[,]'" State Memo. at 17 (quoting Co. at ¶ 44), which section 211-a seeks to limit, are communication forms which "are neither protected by NLRA § 7 nor prohibited by NLRA § 8." Id. at 17. Therefore, the State maintains that such communications are "not . . . activit[ies] to which . . . Machinists preemption applies. Id. at 17 and 18.  The State is fully aware that it "could not prohibit or regulate non-coercive employer expression about unions[;]" but from the State's perspective, the source of "this limitation is the First Amendment, not NLRA preemption." Id. at 18.

As with the market participant exception, given the similarity between the statute at issue in Lockyer and section 211-a, once again Lockyer is instructive. Finding that the Lockyer statute "undermine[d] federal labor policy by altering Congress' design for the collective bargaining process[,]" the Ninth Circuit held the same to be preempted by the NLRA based upon the Machinists doctrine. Lockyer, 364 F.3d at 1159.

In its analysis the Lockyer Court described as "force[ful] the argument by the State and union that the challenged "statute merely affect[ed] California's use of its own funds and d[id] not impermissibly regulate in any area the NRLA intended to be regulation-free." Id. at 1164.  The Court also recognized that "Machinists preemption on restrictions on economic weapons of self-help, . . . poses a particular difficulty in the context of state restrictions on the use of a state's own funds, because when a state imposes such conditions it is arguably not restricting self-help by private parties but merely the degree to which state money is used to fund such self-help." Id. (citation omitted).  Further, the Lockyer Court

30

noted the lack of "directly controlling" Supreme Court cases in this context "[b]ecause the California statute regulates no more than the uses to which [its] own funds are put, rather than imposing a collateral penalty on additional private behavior not funded by the state[.]" Id. at 1164-65 (citations omitted).

Despite the foregoing, the Ninth Circuit held that "the NLRA preempt[ed] the California statute." Id. at 1165. The Court articulated several reasons for its holding. First of all, the Court pointed out that "[t]he [challenged] statute ha[d] both the explicit purpose and the substantive effect of interfering with the NLRA system for organizing labor unions." Id. at 1168. "By explicitly targeting activity designed to 'assist, promote, or deter union organizing' the statue is on its face designed to interfere directly with the NLRA's own system for the promotion or deterrence of union organizing by employers and employees." Id. Thus, the Court found that "[t]he statute would "alter the NLRA process of collective bargaining and union organizing, because an employer who decides against neutrality will incur both compliance costs and litigation risk." Id.

Second, as to compliance costs, the Ninth Circuit pointed out an employer's statutory obligation to "maintain separate accounts for state . . . and non-state funds (it they wish to use any for speech on union organization)," and an employer's concomitant duty to "make those records available to the state's attorney general upon request." Id. (citation omitted). An employer who fails to comply with those obligations "is automatically subject to the statute's remedial provisions." Id. (citations omitted). In this respect, the Lockyer Court found "crucial[]" the fact that not only did the statute contain a provision "for compensatory damages to the state[,]" but it "also ma[d]e employers who violate the statute liable for a civil penalty of up to twice the amount of state funds spent

31

on union organizing." Id. (citations omitted).  By authorizing such a civil penalty, the Lockyer Court found that "the statute imposes not merely a corrective remedy for the misuse of state funds, but risks imposing an actively punitive sanction on employers engaged in union organizing disputes." Id.  In sum, because the "California statute, on its face, directly regulates the union organizing process itself and imposes substantial compliance costs and litigation risks on employers who participate in that process," the Court held that that statute "interfere[d] with an area Congress intended to leave free of state regulation." Id.

The Ninth Circuit's reasoning in Lockyer applies with equal force here.  As previously discussed, section 211-a and the Lockyer statute are remarkably similar.  Therefore, the same concerns which the Lockyer Court expressed as to "alter[ing] the balance of forces in the union organizing processing, [and] interfering directly with a process protected by the NLRA[,]" are also present in this case.  See id. at 1168.  The language of section 211-a which forbids "encourag[ing] or discourag[ing] union organization[,]" like the language of the Lockyer statute, "intefere[d] directly with the NLRA's own system for the promotion or deterrence of union organizing by employers or employees." See id. at 1168.  For example, section 7 of the NLRA gives employees a host of rights, including the right to join a labor union.  See supra at n.4.  Basically under that statute employees also have the right to refuse to join a union.  See id.  It is difficult, if not impossible to see, however, how an employee could intelligently exercise such rights, especially the right to decline union representation, if the employee only hears one side of the story – the union's.  Plainly hindering an employer's ability to disseminate information opposing unionization "interferes directly" with the union organizing process which the NLRA recognizes.  See

<u>Lockyer</u>, 364 F.3d at 1168.

   The court is fully aware that section 211-a is not exactly the same as the California statute, especially when it comes to the remedial provisions thereof. As noted earlier, the <u>Lockyer</u> statute included a state taxpayer suit provision which gives a union in dispute with an employer an additional, self-help economic weapon in the form of the right to bring a lawsuit for violating the statute. Section 211-a lacks such a provision. However, section 211-a allows the state attorney general to "apply . . . for an order enjoining or restraining the commission or continuance of the alleged violation of this section." N.Y. LAB. LAW § 211-a(4). Depending upon the timing of such an order, *e.g.*, in the midst of a union campaign, such state action could have much the same disruptive effect as would the taxpayer lawsuit in <u>Lockyer</u>. Thus, section 211-a "risks imposing an actively punitive sanction on employer engage in union organizing disputes." <u>Lockyer</u>, 364 F.3d at 1168.

   Furthermore, jut like <u>Lockyer</u>, section 211-a includes a substantial financial deterrent to employers contemplating, for example, mounting an anti-union campaign. Section 211-a(4) specifically authorizes not only the return to the state of funds deemed to be "unlawfully expended" thereunder, but also the imposition of "a civil penalty not to exceed one thousand dollars *or* three times the amount of money unlawfully expended, *whichever is greater*[.]" N.Y. LAB. LAW § 211-a(4) (emphasis added). The fact that such penalties are limited to knowing violations, "or where the employer previously had been found to have violated subdivision two within the preceding two years[,]" does not diminish the punitive effect of those penalties. See <u>id.</u>

   Additionally, the mandatory record keeping procedures under section 211-a

33

are in all material respects identical to those found in the <u>Lockyer</u> statute.  Given these similarities between the <u>Lockyer</u> statute and section 211-a, the court finds that the <u>Machinists</u> doctrine operates to preempt the latter under the NLRA.  This result is in keeping with the Supreme Court's "broad[]" construction of <u>Machinists</u> preemption.  <u>See</u> <u>McGowan</u>, 311 F.3d at 509 (internal quotation marks and citations omitted).

The State's argument to the contrary, <i>i.e.</i> that the NLRA neither protects nor prohibits "non-coercive employer communications," and thus <u>Machinists</u> preemption does not come into play here, is unavailing.  <u>See</u> St. Memo. at 17. This argument completely disregards the "extensive jurisprudence" recognized by the <u>Lockyer</u> Court, "emphasizing that open and robust advocacy by both employers and employees must exist in order for the NLRA collective bargaining process to succeed."  <u>See</u> <u>Lockyer</u>, 364 F.3d at 1165 (citing <u>Steam Press Holdings, Inc. v. Hawaii Teamsters & Allied Workers Union</u>, 302 F.3d 998, 1009 (9th Cir. 2002) ("Collective bargaining will not work, nor will labor disputes be susceptible to resolution, unless both labor and management are able to exercise their right to engage in uninhibited, robust, and wide-open debate.") (citing in turn <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 270, 84 S.Ct. 710 (1964)).  Furthermore, adopting the State's reasoning would undermine "[t]he NLRA's declared purpose of . . . 'restor[ing] equality of bargaining power' by, among other ways, 'encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment.'" <u>Id.</u> at 1166 (quoting 29 U.S.C. § 151).  Finally, the court notes that it need not decide, as the State

34

urges, "whether such open debate is an affirmative right that the NLRA 'protects' or 'arguably protects,' which would be necessary predicates for a finding of Garmon preemption[.]" Id. at 1166 n. 6.  It is not necessary to decide that issue because the court endorses the Ninth Circuit's "belief that [section 211-a] is preempted under Machinists from regulating pro- or anti-unionization advocacy because such regulation interferes with the *process* protected by the NLRA, not any specific right protected by the statute." Id. (emphasis added by Lockyer Court).

Having determined that based upon the  Machinists doctrine, the NLRA preempts section 211-a, there is no need to address the issue of whether Garmon also might apply to preempt that statute.  Likewise, there is no need for the court to address the separate issue of LMRDA preemption.  The court's ruling as to Machinists preemption renders those other arguments moot.

Before concluding, the court stresses that it is not turning a blind eye to the fact that the State is financially strapped and that section 211-a was its attempt to ensure that "state funds . . . intended for providing desperately needed social services" are not diverted for other purposes.  See Brennan Memo. at 1. Undoubtedly, ensuring "essential state-funded services for the most vulnerable New Yorkers" is a laudable goal.  See id.  However, "[t]he State must take care that, in its zeal to act, it does not do so unnecessarily and outside the permissible bounds of its discretion and thereby tread on the federally protected zone of labor rights." See Rowland, 221 F.Supp.2d at 345.

In sum, the court

(1) DENIES defendants' motion in its entirety;

(2) GRANTS plaintiffs' motion with respect to their first claim for

35

declaratory relief, and in so doing declares that N.Y. LAB. LAW § 211-a is preempted by the National Labor Relations Act under the doctrine of <u>Machinists</u> preemption, and accordingly defendants are permanently enjoined from implementing or enforcing that statute;

(3) DENIES as moot plaintiffs' motion insofar as they are seeking relief with respect to their second, third, fourth, and fifth causes of action.

The Clerk of the Court is directed to enter judgment in favor of the plaintiffs in accordance herewith and to dismiss this action in its entirety.

IT IS SO ORDERED.

DATED: May 17, 2005
      Syracuse, New York

                              Neal P. McCurn
                              Senior U.S. District Judge

36