UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

HEALTHCARE ASSOCIATION OF NEW YORK
STATE, et al.,

Plaintiffs,

1:03-CV-0413 (NPM) (RFT)

-against-

DAVID A. PATERSON, Governor of the State of New
York; ANDREW M. CUOMO, Attorney General of the
State of New York; and M. PATRICIA SMITH,
Commissioner of Labor of the State of New York,

Defendants.

---

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

ANDREW M. CUOMO
ATTORNEY GENERAL OF THE
  STATE OF NEW YORK
By:

PATRICIA KAKALEC
Assistant Attorney General in Charge
of Labor Bureau

SETH KUPFERBERG
Assistant Attorney General
Bar Roll No. 512014
Office of the Attorney General
120 Broadway
New York, New York 10271
Telephone: (212) 416-8856
Fax: 212-416-8694
E-mail: seth.kupferberg@ag.ny.gov
Attorney for Defendants

## **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ......................................................................................................1

STATEMENT OF THE CASE........................................................................................................5

ARGUMENT..................................................................................................................................6

I. LABOR LAW § 211-A IS MUCH MORE SPECIFIC THAN PLAINTIFFS CLAIM..............6

    A. The Statute As Written and As Applied Before This Litigation....................................6

    B. The Statute As It Will Be Applied ...............................................................................8

    C. Plaintiffs' Claim That § 211-a Reflects "Crafty" Drafting ..........................................13

II. CAL. GOV. CODE §§ 16645-16649 IS QUITE DIFFERENT FROM § 211-A ...................14

III. *CHAMBER v. BROWN* DOES NOT SUPPORT SUMMARY JUDGMENT........................16

IV. SUMMARY JUDGMENT UNDER *MACHINISTS* IS INAPPROPRIATE..........................21

CONCLUSION..............................................................................................................................25

## TABLE OF AUTHORITIES

Page

### CASES

*Bldg. & Constr. Trades Council v. Associated Builders & Contractors ("Boston Harbor")*,
507 U.S. 218 (1993) ....................................................................................................24

*Burgio and Campofelice, Inc. v. N.Y. State Dep't of Labor*, 107 F.3d 1000 (2d Cir. 1999) ...10, 12

*California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572 (1999).......................................12

*Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686 (5th Cir. 1999) ........ 23-24

*Chamber of Commerce v. Brown*, 128 S.Ct. 2408 (2008) .................. 1, 2-3, 4, 5-6, 9, 13-14, 16-21

*Chamber of Commerce v. Lockyer*, 225 F.Supp.2d 1199 (S.D.Cal. 2002), *aff'd*,
422 F.3d 973 (9th Cir. 2005), *vacated and rev'd en banc*, 463 F.3d 1076 (9th Cir. 2006),
*rev'd sub nom. Chamber of Commerce v. Brown*, 128 S.Ct. 2408 (2008) ................................ 3-4

*Community Health Ctr. v. Wilson-Coker*, 311 F.3d 132 (2d Cir. 2002).......................................12

*Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473 (2002)................................................12

*Edwards v. Aguillard*, 482 U.S. 578 (1987) ..............................................................................13

*Gen. Elec. Co. v. N.Y. State Dep't of Labor*, 936 F.2d 1448 (2d Cir. 1998) ................................12

*Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103 (1989) ............................. 1-2, 21

*Healthcare Ass'n v. Pataki*, 388 F.Supp.2d 6 (N.D.N.Y. 2005), Docket # 71,
*rev'd*, 471 F.3d 87 (2d Cir. 2006), Docket # 79-1 .................................2, 4, 9, 10-11, 17-18, 23-24

*Healthcare Ass'n v. Pataki*, 471 F.3d 87 (2d Cir. 2006), Docket # 79-1 ....... 2, 3, 5-6, 9, 16, 20, 24

*Machinists v. Wisc. Employment Relations Comm'n*, 427 U.S. 132 (1976)........... 1-2, 9, 16, 21-25

*NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969) .......................................................................20

*Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591 (2d Cir. 1993)....................................................12

*San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959)...........................................9, 25

*Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768 (2d Cir. 2002)..................................................12

## STATUTES AND REGULATIONS

Cal. Gov. Code §§ 16645-16649 .......................................................................2-3, 4-5, 9, 13-21

2000 Cal. Stats. ch. 872, § 1 ..........................................................................................16, 18, 19

N.Y. Executive Law § 63(12) ......................................................................................................8

N.Y. Labor Law § 211-a ....................................................................................................*passim*

N.Y. Public Health Law § 2807-c(31) .......................................................................................11

National Labor Relations Act, 29 U.S.C. §§ 151-169 ..............................................................1-3

Medicare, 42 U.S.C. § 1395x .....................................................................................................8

10 N.Y.C.R.R. § 86-1.13(a) .......................................................................................................11

10 N.Y.C.R.R. § 415.30 ............................................................................................................10

## OTHER AUTHORITY

*Independence Residences, Inc.*, NLRB Case No. 29-RC-10030, Recommended Decision on
Objections ...............................................................................................................................23

B. Kaufman and P. Stephan, "The Role of Management Attorneys in Union Organizing
Campaigns," 48 *Ind. & Lab. Rel. Rev.* 439 (1995), Docket # 66-25 ............................................11

E. Sclar, *You Don't Always Get What You Pay For: The Economics of Privatization* (2000),
Docket ## 66-21 and -22..............................................................................................................11

M. Warner and A. Hefetz, "Privatization and the Market Structuring Role of Local Government"
(2000), Docket ## 66-24 ..............................................................................................................11

Defendants David A. Paterson, Governor of the State of New York; Andrew M. Cuomo, Attorney General of the State of New York ("Attorney General"); and Colleen Gardner, Commissioner of Labor of the State of New York ("Commissioner")[1]; by their attorney the Attorney General, respectfully submit this Memorandum of Law in opposition to plaintiffs' Motion for Summary Judgment.

## PRELIMINARY STATEMENT

The sole issue on this motion is whether New York Labor Law § 211-a is preempted as a matter of law by the National Labor Relations Act, 29 U.S.C. §§ 151-169 ("NLRA"), under precedent springing from *Machinists v. Wisc. Employment Relations Comm'n*, 427 U.S. 132 (1976) ("*Machinists*"). Defendants argue that it is not. The Complaint includes other claims, but Plaintiffs chose not to raise them on this motion. It is restricted to the *Machinists* issue, which Plaintiffs claim was "definitively decided" when *Chamber of Commerce v. Brown*, 128 S.Ct. 2408 (2008), found preemption of a California statute. *See* Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Brief"), Docket # 101, at 1 n. 1.

Labor Law § 211-a(2) prohibits employer use of State-appropriated funds for three activities: to "(a) train managers. . . regarding methods to encourage or discourage union organization. . . (b) hire or pay attorneys, consultants or other contractors to encourage or discourage union organization. . . or (c) hire employees or pay the salary. . . of employees whose principal job duties are to encourage or discourage union organization." The NLRA as construed in *Machinists* "creates a free zone from which all

---

[1] M. Patricia Smith is now Solicitor of Labor of the United States. Colleen Gardner replaced her as Commissioner and is automatically substituted as a party pursuant to F.R.C.P. Rule 25(d).

regulation... is excluded." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 111-12 (1989).  Since it is undisputed that activities referred to in § 211-a(2) fall within the *Machinists* "free zone," the question is whether limiting use of State funds, as § 211-a does, constitutes prohibited "regulation," as Plaintiffs claim.

*Healthcare Ass'n v. Pataki*, 471 F.3d 87 (2d Cir. 2006), Docket # 79-1, reversed this Court's initial positive answer to that question, *Healthcare Ass'n v. Pataki*, 388 F.Supp.2d 6 (N.D.N.Y. 2005), Docket # 71, *rev'd*, 471 F.3d 87 (2d Cir. 2006).  The Circuit found summary judgment inappropriate since the answer will ultimately depend on facts: principally, what kind of State appropriation is at issue.  It matters whether "money was given pursuant to a grant, or earned pursuant to a contract," 471 F.3d at 102; whether the State is paying under a "straightforward fixed-price contract[]" or under one that is cost-based in a way that means "that current labor costs can affect the price the State pays," *id.* at 103-4; and whether the difficulty of measuring outcomes in an area like health care renders performance criteria insufficient to protect the State's interest in receiving what it pays for, *id.* at 104-5.  The Circuit remanded for factual development of such questions and others, including whether funds paid under joint federal-State programs like Medicaid "were originally appropriated by the federal government and only pass through the State... or whether they instead are subsidies of State spending decisions" which the State has a "legitimate interest in controlling.... [T]o the extent that section 211-a burdens... use of federal and local monies that only pass through the State, it would constitute an attempt to regulate labor practices," *id.* at 105-106.

After the Circuit declared summary judgment inappropriate, the Supreme Court held in *Chamber v. Brown* that the NLRA preempts a California statute, Cal. Gov. Code

§§ 16645-16649.[2]  This Court's earlier ruling in the present case had noted similarities between § 211-a and the California statute and had relied on earlier rulings finding that statute preempted (later reversed by the Ninth Circuit *en banc* in a ruling reversed in its turn by *Brown*).  The Court recently ruled that *Brown* "changes the relevant law, thereby relieving this Court from the Second Circuit's mandate," and allowed plaintiffs to move again for summary judgment, Order of March 23, 2010, Docket # 96, as they have done.

Plaintiffs' main argument is that § 211-a is so similar to the statute at issue in *Chamber v. Brown* that it must be preempted too.  *See* Plaintiffs' Brief at 1.  However, the reasons *Brown* gave to find that law preempted – that its stated goal was to further a labor policy, and its effect "to make union-related advocacy prohibitively expensive" and create "deterrent litigation risks" even if employers did not use State funds, 128 S.Ct. at 2415-2416 – do not apply to § 211-a, which, as discussed below, states as its goal a procurement policy, namely, making sure scarce State resources are spent for the purpose for which they were appropriated, and has both substantive and enforcement provisions materially different from California's.  The Supreme Court was aware of § 211-a and the present litigation,[3] but said nothing about them in the *Brown* opinion.  *Brown* does not result in preemption of § 211-a.

---

[2] Technically *Brown* concerned only §§ 16645.2 and 16645.7, respectively governing State grant recipients and employers receiving over $10,000 a year from the State for participation in State programs.  The *Brown* plaintiffs had lacked standing to challenge provisions governing other employers receiving State funds.  *See Chamber of Commerce v. Lockyer*, 225 F.Supp.2d 1199, 1202-3 (S.D. Cal. 2002), *aff'd*, 422 F.3d 973, 976 n. 1 (9th Cir. 2005), *vacated and rev'd en banc*, 463 F.3d 1076, 1097 n. 22 (9th Cir. 2006), *rev'd sub nom. Chamber v. Brown*, 128 S.Ct. 2408 at 2412 n. 1.

[3] The petition for certiorari in *Brown* (then titled *Chamber v. Lockyer*) had argued that the Ninth Circuit ruling which the petitioners sought, ultimately successfully, to overturn, conflicted with the Second Circuit's ruling in the present case.  *See Chamber v. Lockyer*,

The Second Circuit's ruling limits interpretation and enforcement of § 211-a. Under that ruling, § 211-a can be applied to grants; whether and to what extent contracts to which it is also applicable exist can only be determined by considering Medicaid or other funding programs in detail. The Commissioner is drafting interpretive regulations, as § 211-(5) requires[4]; until published regulations clarify the issues, the Attorney General will not take action under the statute with respect to joint federal-State funding programs including Medicaid, the focus of Plaintiffs' challenge. There is thus no current possibility of encroachment on NLRA policy, nor have Plaintiffs identified any past or current encroachment on their ability to engage in whatever activity they like. Whatever might be true if they challenged a hypothetical specific future act by the Commissioner or Attorney General in interpreting or enforcing § 211-a, at present it is certainly not true that undisputed facts show § 211-a as a whole to be preempted.

The statute *Brown* found preempted and § 211-a have significant differences both as written and as § 211-a will be applied. Unlike California's law, § 211-a does not apply to all employer union-related advocacy, only to specific activities listed in § 211-a(2). It does not limit use of commingled State and non-State funds, requires no or negligible new record-keeping, and permits enforcement only by the Attorney General, not by unions bringing lawsuits and seeking attorneys' fees. Application is further limited by the Second Circuit ruling; at least until published regulations clarify the extent, if any, to

---

2007 WL 43251 (U.S.), **12-18 (Petition). Both Plaintiffs and Defendants in the present case also filed *amicus* briefs in *Brown*.

[4] For most of the time since § 211-a was expanded in 2002, implementation was legally precluded.

which Medicaid and similar programs fall within the statute, it will not be applied to them at all. Plaintiffs' facial preemption challenge cannot be sustained on summary judgment.

## STATEMENT OF THE CASE

Plaintiffs, employer associations or employers in the health care field, filed this suit in 2003, seeking to have § 211-a declared invalid and its enforcement enjoined. The Amended Complaint ("Complaint"), Docket # 16, alleges that Plaintiffs or those they represent receive funds "in some form... appropriated by the State," principally Medicaid payments (Complaint ¶16); that Plaintiffs "expect to be subjected to union organizing" and "will need to or intend to spend... state-appropriated monies" for activities within the scope of § 211-a (¶¶ 23 and 44); and that § 211-a "would preclude or impair their ability to encourage or discourage unionization" (¶ 57). However, there is no claim that § 211-a has actually precluded any of the Plaintiffs from any activity. The single enforcement effort cited (Complaint ¶¶ 47-48; Affidavit of Marc Brandt, Docket # 32-7, ¶¶ 4-6), by the Attorney General in 1999, is discussed in Point I(A) below.

Plaintiffs moved for summary judgment, which this Court granted in May 2005, permanently enjoining § 211-a's implementation or enforcement. The injunction was not lifted until March 2008. Mandate, Docket # 79. By then, the parties had agreed in a letter "So Ordered" by the Court in January 2008 that while § 211-a and the law challenged in *Chamber v. Brown* are "not identical... , there is sufficient overlap between the issues in the two cases so that... it makes sense to await the Supreme Court's decision... before proceeding," and that "In the meantime, the defendants will voluntarily refrain from enforcement activity." Order Staying Case, Docket # 78. When *Brown* was decided in June 2008, the parties disagreed about whether it superseded the Second

Circuit mandate and agreed to resolve that issue before proceeding; the Attorney General

agreed to continue to refrain from enforcement in the meantime. Order and Status

Report, Docket ## 81 and 83. In March 2010 the Court found the mandate superseded

and allowed Plaintiffs to move again for summary judgment, as they have done.

## ARGUMENT

### POINT I

**LABOR LAW § 211-A IS MUCH MORE SPECIFIC THAN PLAINTIFFS CLAIM**

#### A. The Statute As Written and As Applied Before This Litigation

Plaintiffs' Brief states, at 2, that § 211-a "prohibits the 'use of state funds and

property to encourage or discourage... union organization'" (quoting § 211-a(1)),

implying that it prohibits *all* such use of State funds. In reality, the statute is much more

specific. It has five sections. The first states the Legislature's findings and purpose:

"sound fiscal management requires vigilance to ensure that funds appropriated by the

legislature for the purchase of goods and provision of needed services are ultimately

expended solely for the purpose for which they were appropriated." Otherwise,

> the proprietary interests of this state are adversely affected. As a result,
> the legislature declares that the use of state funds and property to
> encourage or discourage employees from union organization constitutes a
> misuse of the public funds and a misapplication of scarce public resources,
> which should be utilized solely for the public purpose for which they were
> appropriated. (§ 211-a(1))

Despite this general finding, and in contrast to the California statute (as discussed in

Point II below), § 211-a does not prohibit all use of State funds and property to encourage

or discourage unionization.

The statute is much more limited. Its second section states that "no monies

appropriated by the state for any purpose shall be used or made available to employers"

6

for three specific activities: training managers and hiring lawyers or consultants to encourage or discourage unionization, and hiring employees principally for that specific function. (§ 211-a(2)) A third section requires employers that engage in these three activities to maintain sufficient records "to show that state funds were not used to pay for such activities," and to make the records available "to the state entity that provided such funds and the attorney general" upon request. (§ 211-a(3)) A fourth section permits the Attorney General to seek court orders enjoining statutory violations, ordering the return to the state of unlawfully spent funds, and imposing civil penalties normally not to exceed $1,000. (§ 211-a(4)) The last section directs the Commissioner to "promulgate regulations describing the form and content of the financial records required… and… provide advice and guidance to state entities… as to the implementation of contractual and administrative measures to enforce the purposes of this section." ((§ 211-a(5))

In part because of the present litigation, the record shows only a single application of an older version of § 211-a.[5] As originally enacted in 1996, prior to a 2002 amendment, the statute included only what later became § 211-a(2)(a), barring use of State-appropriated funds to train managers in union-related advocacy. In 1999, the Attorney General investigated a chapter of NYSARC, Inc., one of the Plaintiffs, which was 98% publicly funded, to see if it had violated "state and federal law" by spending "Medicaid and state funding" to train managers in methods to discourage unionization.

---

[5] The Affidavit of Michael Parker, Docket # 32-9, ¶ 16, refers to a supposed additional instance, alleging that the New York State Comptroller's Office stated "that the Comptroller will open an investigation" of an affiliate of one of the Plaintiffs. The supposedly supporting exhibit, an October 2003 letter from a Special Assistant to the Comptroller included in Docket # 32-10, states only that county legislators expressed concern and that a meeting to discuss both this and other issues was requested. The letter's author denies Dr. Parker's reading. *See* Affidavit of Leonard A. Mancusi, Docket # 33-23. And, enforcement by the Comptroller is not even authorized by § 211-a.

Exhibit A to Affidavit of Marc Brandt, Docket # 32-8. The investigation invoked § 211-a, federal law (42 U.S.C. § 1395x) excluding the cost of "activities directly related to influencing employees respecting unionization" from Medicare reimbursement, and New York Executive Law § 63(12), which gives the Attorney General broad power to investigate business illegality. *Id.* The investigation was resolved in 2000 when the chapter agreed that the $12,358 it had spent on training was non-reimbursable, and pointed out that its existing Consolidated Fiscal Report for 1999 reported $242,517 in revenue from non-State sources, far more than the $12,358 within the scope of § 211-a. Affidavit of Patricia Smith, Docket # 33-26, ¶ 3 and Exhibit A, Docket # 33-27.

As written and as enforced, § 211-a thus applies to three specific employer activities, not to all employer use of State funds to encourage or discourage unionization. And employers meet the statute's requirements if their existing records show that non-State funding exceeds spending on § 211-a activities.

### B.  The Statute As It Will Be Applied

Since this suit's filing, it has made sense for public agencies to await judicial clarification concerning § 211-a, and from May 2005, implementation was precluded. The Commissioner has not promulgated regulations even though § 211-a (5) directs her to promulgate regulations as to "the form and content of the financial records required" and advise state entities, and even though drafting of regulations was in process in 2003, Affidavit of Jerome Tracy, Docket # 33-34, ¶ 4. Drafting is again in progress; a draft will be circulated for comment by interested parties including the Plaintiffs in the present case by the fall. *See* Declaration of Maria Colavito ("Colavito Declaration") filed herewith.

As stated in the Colavito Declaration and that of Patricia Kakalec ("Kakalec Declaration") also filed herewith, the Commissioner and Attorney General in interpreting and enforcing the statute pursuant to § 211-a(4) and (5) respectively will follow three guidelines listed below.[6]  There is no likelihood implementation of § 211-a under these guidelines will encroach on NLRA policy, and certainly no basis to find preemption on summary judgment.

*First*, § 211-a does not require employers to segregate State appropriations from other funds, limit use of commingled funds, or impose burdens based on the fiction that money is not fungible.  As discussed in Point II below, all this differs from the California statute.  The Attorney General, as shown by the NYSARC investigation's resolution, has always required only that employers be able to show that funding from non-State sources (exclusive of earmarked funds, for example, funds restricted to capital expenditures) exceeds spending on § 211-a activities.  The Commissioner's regulations will take the same approach.  Colavito Declaration.

---

[6] The first two were always followed by the Attorney General: for example, in resolution of the NYSARC investigation in 2000.  The third derives from the Second Circuit's ruling, 471 F.3d 87.  Though this Court has found that *Brown* changed relevant law enough to permit consideration of another summary judgment motion, that ruling will continue to limit interpretation of § 211-a.  While only *Machinists* preemption is currently before the Court, Defendants submit that its finding that *Brown* changed relevant law applies to the Circuit's statement that § 211-a would be preempted to the same extent under precedent derived from *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959), as under precedent derived from *Machinists*.  471 F.3d at 108 ("the *Machinists* question will depend on the same factors we have identified as determinative in our *Garmon* discussion"); *id.* at 110-111 (Wesley, J., concurring) ("disagree[ing] with the majority's conclusion that *Garmon* applies").  Like this Court's earlier ruling, *see* 388 F.Supp.2d at 25 ("no need to address" *Garmon*), *Brown* was decided under *Machinists* without reaching *Garmon*, *see* 128 S.Ct. at 2412.  Invoking *Garmon* raises a controversial issue – whether the NLRA affirmatively protects employer advocacy, or merely makes clear that it is not to be regulated – that makes no difference to this case (as is clear from the Second Circuit's ruling), but is significant elsewhere.  *Brown* shows that such cases should first be analyzed under *Machinists*, not *Garmon*.

*Second*, employers can use records they already have for other reasons, including other State and/or federal requirements, both to meet § 211-a(3)'s recordkeeping requirement and to prove substantive compliance with § 211-a(2). Entities like the Plaintiffs already record, track and account for expenses and revenues.[7] Especially since employers need only show that their § 211-a(2) spending does not exceed non-State funding, § 211-a(3)'s recordkeeping requirement is neither new for most employers nor burdensome for any. *Cf. Burgio and Campofelice, Inc. v. N.Y. State Dep't of Labor*, 107 F.3d 1000, 1009 (2d Cir. 1999) (no preemption of prevailing wage statute since producing records is "so slight" a burden). Again, in the NYSARC investigation the Attorney General so applied § 211-a even before § 211-a(3)'s enactment. Exhibit A to Affidavit of Marc Brandt, Docket # 32-8 ("10 NYCRR § 415.30 requires nursing homes to maintain financial records which identify all income by source and describe all expenditures by category; therefore, Ulster-Greene ARC should be able to provide immediately upon request records…."). And again, the Commissioner will take a similar approach. Colavito Declaration.

*Third*, the Second Circuit's opinion, 471 F.3d 87, implies narrow limits, which regulations under § 211-a(5) should clarify, on the appropriations to which the statute will apply. For example, § 211-a can be applied to grants but not to "straightforward fixed-price contracts," or even cost-based contracts unless labor-related expenses can "affect the price the State pays;" there might be exceptions if the difficulty of measuring outcomes makes performance criteria insufficient to protect the State's interest in

---

[7] *See, e.g.*, Exhibit B to Colavito Declaration; Affidavit of Steven Krause, Docket # 33-22, ¶¶ 3-7; Declaration of Rick Surpin, Docket # 33-25, ¶¶ 4-6; Affidavit of Patricia Smith, Docket # 33-26, ¶ 4 and Exhibit B, Docket # 33-28; Affidavit of Jerome Tracy, Docket # 33-34, ¶ 7, and Exhibit A, Docket # 33-35.

receiving what it pays for. 471 F.3d at 102-5. In drafting regulations, the Commissioner will consider specific funding mechanisms and application of these criteria to them.[8] Colavito Declaration.

Furthermore, Plaintiffs' concern is Medicaid and, to a lesser extent, other cooperative federal-State programs. Complaint, Docket # 16, ¶¶ 17-22 and 47-57; Plaintiffs' Local Rule 7.1(a)(3) Statement, Docket # 100-1, ¶¶ 2, 4-6, 8, 10 and 15-17. The Commissioner has stated, *see* Colavito Declaration, that she will consider whether and if at all, to what extent funding under such programs can be covered by § 211-a in light of the Second Circuit's ruling that the latter cannot be applied to funds that "only pass through the State," as distinguished from "State spending decisions" which the State has a "legitimate interest in controlling" even if they are subsidized, 471 F.3d at 105-6.

---

[8] That § 211-a is applicable in narrow circumstances does not imply – as the Second Circuit's reversal of summary judgment shows – that it is *never* applicable. For possible examples besides grants, *see*, *e.g.*, New York Public Health Law § 2807-c(31) (permitting adjustment of hospital reimbursement rates for "extraordinary costs" associated with worker recruitment and retention), and 10 NYCRR § 86-1.13(a) (basing home health agency payment rates on a facility's costs for the year "ending two years prior to the rate period"). The Commissioner, in the first instance, will have to consider whether under such rules, spending on § 211-a activities can affect State costs. In other cases, the difficulty of measuring outcomes may justify a safeguard against diversion from State funding of large sums while needs for which the money was intended are neglected. *See generally* E. Sclar, *You Don't Always Get What You Pay For: The Economics of Privatization* (2000), (Docket ## 66-21 and -22, at 34-37, 44 ("Many seemingly straightforward public services are, in fact, more subtly complex in terms of outcomes") and 157 (discussing "problems of accountability and control"); M. Warner and A. Hefetz, "Privatization and the Market Structuring Role of Local Government" (2000), Docket # 66-24, at 3 ("the complex nature of many local government services is hard to specify in a contract.... and quality may be hard to monitor"); B. Kaufman and P. Stephan, "The Role of Management Attorneys in Union Organizing Campaigns," 48 *Ind. & Lab. Rel. Rev.* 439, 443 (1995), Docket # 66-25 (cost of lawyer-run anti-union campaign ranges from $20,000 to over $1 million); Exhibit to Affidavit of Patricia Smith, Docket # 33-27 (NYSARC chapter devoted 10% of its total adjusted expenses for 1999 to training managers in discouraging unionization – NYSARC exists to serve the retarded and is 95% funded through Medicaid, *see* Affidavit of Marc Brandt, Docket # 32-7, ¶ 3).

Such analysis will mean considering both the programs' overall nature,[9] and specific funding mechanisms within Medicaid and other programs. At least until published regulations have clarified the issues, the Attorney General will not apply § 211-a to Medicaid or similar federal-State programs at all. Kakalec Declaration.

This means that there is no chance § 211-a will improperly limit Plaintiffs, at least until regulations are promulgated and/or the Attorney General enforces § 211-a. At that point, hypothetical specific error, not the statute as a whole, might be subject to challenge: an agency that overreaches is not told to stop enforcing a statute altogether. *See*, *e.g.*, *Gen. Elec. Co. v. N.Y. State Dep't of Labor*, 936 F.2d 1448, 1456 (2d Cir. 1998) ("that a statute might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid"); *Burgio*, 107 F.3d at 1008-9 (unlike previous enforcement of prevailing wage law, Commissioner's new approach was not preempted, at least for summary judgment purposes). A facial challenge "'must establish that *no set of circumstances* exists under which the [challenged a]ct would be valid.'" *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 595 (2d Cir. 1993) (emphasis in original) (quoting *Gen. Elec.* and citing, among other cases, *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 593 (1999) (to defeat a facial preemption challenge, the State "needed merely to identify a possible set of permit conditions not in conflict with federal law")). Summary judgment sustaining Plaintiffs' facial challenge to the statute must be denied.

---

[9] *See*, *e.g.*, *Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473, 495 (2002) (noting "leeway for state choices" typical of federal-State programs); *Community Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 139 (2d Cir. 2002) (presuming Medicaid is designed to encourage State decision-making); *Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768, 777 (2d Cir. 2002) (Individuals with Disabilities Education Act leaves "states to determine how to implement the statute's goals").

## C. Plaintiffs' Claim That § 211-a Reflects "Crafty" Drafting

Plaintiffs and their *amicus* the Chamber of Commerce ("Chamber") argue that the procurement concern stated in § 211-a(1) is just a matter of "crafty" drafting and "professing an allegedly neutral purpose," *see* Plaintiffs' Brief at 13-14, and imply that the stated purpose should be disregarded. It is true that despite "normal[] deferen[ce] to a State's articulation" of statutory purpose, an unconstitutional law is not saved by a stated proper purpose at odds with the statute's contents and the legislators' intent. *Edwards v. Aguillard*, 482 U.S. 578, 586-596 (1987). In the present case, however, nothing supports Plaintiffs' belief that the stated statutory purpose is not genuine.[10]

The Chamber Brief, at 4, distorts Defendants' argument by saying it is "solely" that § 211-a states a proper purpose. Defendants' point is that § 211-a(2)'s limited substantive requirements and the enforcement mechanisms of §§ 211-a(3)-(5) conform to § 211-a(1)'s proper stated purpose. In telling contrast, *Chamber v. Brown*, as discussed in Point III below, both discussed at length the *im*proper stated purpose of Cal. Gov. Code §§ 16645-16649, and explained why that statute's substantive requirements and enforcement mechanisms, which differ sharply from those of § 211-a, were better suited

---

[10] This Court previously refused to consider documents offered by Defendants and its *amicus* the Brennan Center for Justice to substantiate the context and genuineness of the stated procurement concern (*see* Docket # 66, ¶¶ 4-10), ruling that their filing as part of Defendants' "Rule 12(b)(6) motion rather than a Rule 56 motion, limits the scope of the record." 388 F.Supp. 2d at 9; *see also* 471 F.3d at 94 (discussing and seemingly disagreeing with the ruling). On the current Rule 56 motion these documents, including some cited at n. 8 above, can and should be considered.

to discouraging employers from union-related advocacy *at all*, than in ensuring that State-appropriated funds were not misused.[11]

## POINT II

### CAL. GOV. CODE §§ 16645-16649 IS QUITE DIFFERENT FROM § 211-A

The California statute found preempted in *Chamber v. Brown* resembles § 211-a in that it restricts employer use of State-appropriated funds, but in other ways, the statutes are quite different. First of all, the California law, unlike the actual § 211-a (as opposed to Plaintiffs' caricature), does not list specific employer activities for which State funds cannot be used, but applies to "*any* attempt by an employer to influence the decision of its employees… or those of its subcontractors regarding… whether to support or oppose a labor organization" and "*any* costs" of the attempt. Cal. Gov. Code §§ 16645(a), 16645.1(a), 16645.2(a), 16645.4(a), 16645.7(a) (emphasis supplied). That expressly includes, for example, not just the wages of employees whose principal job duty is union-related advocacy, as under § 211-a(2)(c), but also those of any ordinary supervisor or employee who "carr[ies] out, an activity to assist, promote or deter union organizing." Cal. Gov. Code § 16646(a).

The statute further declares that "if state funds and other funds are commingled, any expenditures to assist, promote, or deter union organizing shall be allocated between

---

[11] The Chamber Brief at 5 also mischaracterizes Defendants' reply brief in the Second Circuit, falsely claiming it "*conceded*" that § 211-a has a labor policy objective "when it described 211-a's 'refusal to fund' employer speech as necessary 'to keep the State neutral in *labor* disputes" (emphasis in the Chamber Brief). The sentences which the Chamber cites say the opposite: they defend the State's "attempt to ensure proper use of its limited state resources, thereby also remaining neutral in a labor dispute," and state that "refusal to fund a particular activity does not, as a matter of law, constitute 'interference' with that activity."

state funds and other funds on a pro rata basis." Cal. Gov. Code § 16646(b). An

employer must thus either segregate State-appropriated funds or violate the statute even

though it has plenty of non-State funds for all it does, unlike under § 211-a.

California's record-keeping requirement, like § 211-a(3) requiring records

"sufficient to show that state funds were not used to pay for such activities," requires

records "sufficient to show that no state funds were used for those expenditures." Cal.

Gov. Code §§ 16645.1(b), 16645.2(c), 16645.4(c) and 16645.7(c). But the above

differences make the content of the two record-keeping requirements different despite the

similarity in form. Because California's "expenditures" are not limited to discrete,

specified costs but include "any costs" of "any attempt" to influence workers, it is much

less clear what is "sufficient to show that no state funds were used for those

expenditures," and much less likely existing records suffice. Nor can California

employers simply show, like the NYSARC chapter investigated in 1999, that funds from

non-State sources exceed spending on covered activity; unlike § 211-a, the California law

expressly requires allocation to State and non-State funds "on a pro rata basis."

California's enforcement provisions are in even more obvious contrast to § 211-a,

further enhancing such other differences. Unlike § 211-a which allows enforcement only

by the Attorney General, California authorized enforcement suits "by the Attorney

General, *or by any state taxpayer*,... for injunctive relief, damages, civil penalties, and

other appropriate equitable relief.... A prevailing plaintiff in any action under this section

is entitled to recover reasonable attorney's fees." *See* Cal. Gov. Code § 16645.8(a) and

(d) (emphasis supplied).

15

Finally, as emphasized (as discussed in Point III below) in *Chamber v. Brown*, the California Legislature stated a concern different from § 211-a(1)'s procurement concern: "It is the policy of the state not to interfere with an employee's choice about whether to join or to be represented by a labor union. *For this reason*, the state should not subsidize efforts by an employer to assist, promote, or deter union organizing." *See* 2000 Cal. Stats. ch. 872, § 1 (emphasis supplied). As recognized in *Brown*, the burdens and risks imposed by the California statute, but not, as discussed above, by § 211-a, were not accidental but were suited to this stated goal, also different from that of § 211-a: not a procurement policy but the labor policy of preventing what the California Legislature deemed interference with worker choice.

## POINT III

### *CHAMBER v. BROWN* DOES NOT SUPPORT SUMMARY JUDGMENT

The Second Circuit has already found Plaintiffs' facial *Machinists* preemption challenge inadequate for summary judgment purposes. The only way that would not remain true is if *Chamber v. Brown*'s finding of preemption of Cal. Gov. Code §§ 16645-16649 required a different result, an issue which this Court's March 2010 Order allowed Plaintiffs to raise through a second summary judgment motion, but did not decide. The premise of Plaintiffs' Brief is that New York's and California's statutes were already found materially identical for *Machinists* purposes by this Court; accordingly, they reason, *Brown*'s holding extends to § 211-a as well. But Plaintiffs' premise that § 211-a and Cal. Gov. Code §§ 16645-16649 are identical is wrong, nor did this Court find them materially identical. Both the stated purpose of the California statute, and the burdens and risks it imposes and which *Chamber v. Brown* found preempted, are materially

16

different from those of § 211-a. Consequently, *Brown* does not support summary judgment in this case.

Plaintiffs' Brief notes at 3-4 that this Court's later-reversed opinion called Cal. Gov. Code §§ 16645-16649 "similar[]" to § 211-a, and litigation about preemption of that statute "instructive." They infer that since that litigation culminated in *Brown*'s holding that the California statute *is* preempted, § 211-a must be preempted too. But contrary to Plaintiffs' Brief at 7 and 12-14, this Court never declared § 211-a and the California statute "materially identical" or "materially the same, for the purpose of a *Machinists* preemption analysis," and they are materially different. The frame of reference of this Court's earlier discussion was not the *Brown* opinion issued years later: Plaintiffs take the Court's words out of context. For example, Plaintiffs' Brief notes at 4 that the Court called "certain aspects" of § 211-a "nearly identical" to the California statute, but fails to specify which aspects: the "near[] identi[ty]" was between § 211-a(3)'s and the California statute's requirements that employers have records "sufficient to show" compliance with the respective statutes. *See* 388 F.Supp.2d at 18; *cf. id.* at 24. As discussed in Point II above, the two requirements differ in substance despite their near identity in form, with California's requirement much more burdensome.

This Court also noted differences between § 211-a and the California law, including their stated purposes:

> Because "the [California] statute's preamble... ma[d]e clear that the legislative purpose [wa]s not procurement, but preventing the state from influencing employee choice..." it is easy to see how that statute "on its face d[id] not purport to reflect California's interest in the efficient procurement of goods and services[.]"....

> In contrast, the Legislative Memorandum addressing the amendment of
> section 211-a explicitly sets forth a proprietary, not a regulatory
> purpose....

388 F.Supp.2d at 19-20 (citations omitted). The Court was "fully aware" that § 211-a "is

not exactly the same as the California statute, especially when it comes to the remedial

provisions" – for example, the Court's opinion noted, California "gives a union in dispute

with an employer an additional, self-help economic weapon in the form of the right to

bring a lawsuit." *Id.* at 24. In any event, this Court has now called for a fresh look in

light of *Chamber v. Brown*: the question is not how similar it deemed the statutes in the

past, but whether they are similar *under standards indicated by that opinion*. Under those

standards, the statutes are materially different.

*Brown* first noted that California's statute, "[a]s set forth in the preamble," was

enacted to implement a State policy against "interfer[ing] with an employee's choice;"

the Legislature declared that "[f]or this reason," California should not subsidize employer

efforts with respect to union organizing. 128 S.Ct. at 2411 (quoting 2000 Cal. Stats., ch.

872). The Court next noted California's "formidable enforcement scheme," including

several provisions without any § 211-a equivalent: for example, that absent segregation

of funds the "statute presumes that any expenditures to assist, promote, or deter union

organizing derive in part from state funds," and that the standard penalty for a violation is

double the unlawfully spent funds. And, suspected violators may be sued by "any private

taxpayer, and prevailing plaintiffs are 'entitled to recover reasonable attorney's fees.'"

*Id.* at 2411 (quoting Cal. Gov. Code § 16645.8(d)).

*Brown*'s preemption analysis conforms to this summary of the statute at issue and

makes clear that under the opinion's standards § 211-a, which differs from the California

statute in virtually every respect relied on in the opinion, cannot be found preempted as a matter of law:

> California's policy judgment that partisan employer speech necessarily "interfere[s] with an employee's choice about whether to join or to be represented by a labor union," 2000 Cal. Stats. ch. 872, § 1, is the same policy judgment that the NLRB advanced under the Wagner Act, and that Congress renounced in the Taft-Hartley Act. To the extent §§ 16645.2 and 16645.7 actually further the express goal of AB 1889, the provisions are unequivocally preempted....

> As the statute's preamble candidly acknowledges, the legislative purpose is not the efficient procurement of goods and services, but the furtherance of a labor policy.... Although a State has a legitimate proprietary interest in ensuring that state funds are spent in accordance with the purposes for which they are appropriated, this is not the objective of AB 1889.

*Id.* at 2415-2416. By contrast, § 211-a's policy judgment and stated purpose are not that employer speech interferes with employee choice and therefore should not be subsidized, but that the State should ensure that funds are spent in accordance with the purposes for which they are appropriated, the very interest *Brown* declared legitimate.

When the respondents in *Brown* argued that California had only restricted use of State funds, the Supreme Court found that inconsequential, "at least in this case," because the statute at issue coupled its limits on use of State funds

> with compliance costs and litigation risks that are calculated to make union-related advocacy prohibitively expensive for employers that receive state funds. By making it exceedingly difficult for employers to demonstrate that they have not used state funds and by imposing punitive sanctions for noncompliance, AB 1889 effectively reaches beyond "the use of funds over which California maintains a sovereign interest."

*Id.* at 2416 (quoting California's Brief).

> Turning first to the compliance burdens, AB 1889... conclusively presumes that any expenditure to assist, promote, or deter union organizing made from "commingled" funds constitutes a violation.... Maintaining "sufficient" records and ensuring segregation of funds is no small feat, given that AB 1889 expansively defines its prohibition to

> encompass "any expense" incurred in "any attempt" by an employer to
> "influence the decision of its employees." .... Prohibited expenditures
> include not only discrete expenses such as legal and consulting fees, but
> also an allocation of overhead, including "salaries of supervisors and
> employees," for any time and resources spent on union-related
> advocacy....
>
> The statute also imposes deterrent litigation risks. Significantly, AB 1889
> authorizes not only the California Attorney General but also any private
> taxpayer – including, of course, a union in a dispute with an employer – to
> bring a civil action.... Violators are liable to the State for three times the
> amount of state funds deemed spent on union organizing.... Prevailing
> plaintiffs, and certain prevailing taxpayer intervenors, are entitled to
> recover attorney's fees... which may well dwarf the treble damages
> award. Consequently, a trivial violation of the statute could give rise to
> substantial liability....
>
> In light of these burdens, ... AB 1889's enforcement mechanisms put
> considerable pressure on an employer either to forgo his "free speech right
> to communicate his views to his employees," *Gissel Packing*, 395 U.S. at
> 617, 89 S.Ct. 1918, or else to refuse the receipt of any state funds.

*Id.* at 2416. Employers, in other words, had to forego State funds or take on the

"exceedingly difficult" task of proving no State funds were used if they wished to engage

in union-related advocacy even with *other* funds: use of State spending power to

influence employer behavior which went beyond merely safeguarding State

appropriations. *Cf. Healthcare Ass'n v. Pataki*, 471 F.3d at 102, Docket 79-1 (noting

preemption of statutes which use State spending to "affect the contractors' behavior at all

times, lest it come back to haunt them when they bid for a State contract"). The burdens

and risks emphasized by the Supreme Court are not imposed by § 211-a.

In an earlier Brief, Docket # 87, at 1, Plaintiffs also argued that *Brown* invalidates

distinctions drawn by the Second Circuit because while those are "focused on the

character of the funds at issue," for example, recognizing the State's right to control use

of grant funds, *Brown* preempted California's statute with respect to all kinds of funds,

including grant funds. As discussed above, the California statute expressly endorsed "the same policy judgment… that Congress renounced in the Taft-Hartley Act," presumed that State funds were used for "any" union-related advocacy engaged in by employers and "ma[de] it extremely difficult for employers to demonstrate" otherwise, and allowed "any private taxpayer – including, of course, a union in a dispute with an employer – to bring a civil action" and seek fees "which may well dwarf the treble damages award." 128 S.Ct. at 2415-6. These defects rendered the statute preempted with respect to all kinds of State funds: as to grants, for example, California was not just making sure funds were spent on grant purposes, but was making foregoing union-related advocacy even with non-grant funds a condition or almost a condition of receipt of grants. For § 211-a, based on a procurement policy judgment and with substantive requirements and enforcement provisions different from California's, the Second Circuit's factual questions, intended to insure that the statute accomplishes its stated goal and no more, remain determinative.

POINT IV

**SUMMARY JUDGMENT UNDER *MACHINISTS* IS INAPPROPRIATE**

Summary judgment is also inappropriate under broader *Machinists* precedent. As stated earlier, the NLRA as construed in *Machinists* "creates a free zone from which all regulation… is excluded." *Golden State*, 493 U.S. at 111-12. While activities referred to in § 211-a(2) fall within the free zone, § 211-a does not regulate them; employers including those receiving State funds remain perfectly free to engage in these activities.

For all its rhetoric about how § 211-a "prevent[s] one side in a union organizing campaign – the employer – from" speaking, "impairing the employer's ability to take legitimate steps authorized by federal law" (Complaint, Docket # 16, ¶ 32), the

21

Complaint and Plaintiffs' other papers are devoid of any allegation, much less evidence, that any Plaintiff has actually been prevented from or hampered in doing anything. The closest thing to an exception is a conclusory claim that as a result of the Attorney General's investigation in 1999, a NYSARC chapter "was forced to give up rights that it felt it had under the National Labor Relations Act." Affidavit of Marc Brandt, Docket # 32-7, ¶ 6. However, "Brandt does not specify what those rights are;" the chapter gave up only a supposed "right to report the costs associated with its training of supervisors to discourage the union as reimbursable expenses," a matter separate from any NLRA issue, and not preventing any advocacy. Affidavit of Patricia Smith, Docket # 33-26, at ¶ 3, and its Exhibit A, Docket # 33-27; *see also* Affidavit of David Hill, Docket # 33-21, ¶¶ 5-6 (describing advocacy successfully engaged in by the NYSARC chapter).

Plaintiffs also submitted an employer lawyer's affidavit alleging that his client, which is not a Plaintiff and which received private contributions in its two most recent years of "$12,268 and $97,700 or less than one percent of its budget," was left by § 211-a(2) with "a smaller pot of funds" to engage in covered activities, and as a result waged only a "meager and ineffective" anti-union campaign, including only "neutral... not persuasive" material, nothing "that might be viewed as discouraging." Affidavit of Frederick Braid, Docket # 34-3, ¶¶ 13, 15-16 and 31. Not only does § 211-a not prohibit non-neutral, persuasive material or even use of State-appropriated funds to pay for it,[12] but this employer's campaign actually included extensive use of "themes usually used by anti-union employers, including those identified at the NLRB hearing as typical of anti-

---

[12] As already discussed, § 211-a(2) applies only to three specific activities, including hiring consultants or employees whose primary duty is union-related advocacy, not to advocacy that does not involve such means.

union campaigns by the employer's expert witness." Affidavit of Brent Garren, Docket # 33-2, ¶ 8. After a nine-day hearing, an Administrative Law Judge of the National Labor Relations Board ("NLRB") recommended dismissing objections to the union's election victory which the employer filed based on "self serving, conclusionary and speculative" claims that § 211-a prevented a vigorous anti-union campaign.[13]

In short, nothing supports the claim that § 211-a constrains employers' ability to communicate. At best – which would certainly not be enough to grant a motion for summary judgment now – the claim that employers might sometimes be impaired and for that reason § 211-a might amount to regulation might, if regulations to be promulgated by the Commissioner allegedly overreach and/or in some future specific enforcement context, raise a factual issue. If, in the future, Plaintiffs ever move for summary judgment with respect to a specific and undisputed factual context, or Defendants move for summary judgment pointing to established regulations or other undisputed facts, the Court can evaluate such a hypothetical motion then.

In its earlier ruling, this Court analyzed whether a State policy is regulatory or comes in the State's role as a market participant or proprietor in terms of a two-part test derived from *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686, 693

---

[13] The recommended decision can, as noted in Defendants' 2004 letter to the Court reporting it, Docket # 52, be found on the NLRB website (which still records no decision on the employer's exceptions, Docket # 58-2), and for convenience, is also attached to the Declaration of Seth Kupferberg filed herewith. Its comments on claims about § 211-a's impact apply to Plaintiffs' claims. Besides calling the claims self serving, conclusionary and speculative, the ALJ noted that "No evidence was presented… that IRI would have used but for 211-a, any particular statement… , nor… even that it would have hired a consultant," *see* Recommended Decision in *Independence Residences, Inc.*, NLRB Case No. 29-RC-10030, at 26, and rejected vague and conclusionary claims about onerous record-keeping, especially from an employer "already subject to extensive record keeping requirements," *id.* at 28.

(5th Cir. 1999).  388 F.Supp.2d at 15-20.  The Second Circuit also referred to *Cardinal Towing*, 471 F.3d at 109.  Under that test, § 211-a is not regulatory.[14]

The first *Cardinal Towing* factor is whether an action's purpose reflects a State's procurement interests or an effort to "influence society at large," *see* 180 F.3d at 694. This Court's earlier ruling recognized that § 211-a "explicitly sets forth a proprietary, not a regulatory purpose," but found that its effects in "significantly curtailing the ability of employers to voice their opposition to unions" nevertheless pointed towards regulation. 388 F.Supp.2d at 19-20.  Assuming this general approach is correct, *but see* 471 F.3d at 108 ("[w]e cannot agree that the degree to which the associations are actually able to mount effective campaigns should be determinative"), there is, as shown above, no basis to conclude as a matter of law that § 211-a significantly curtails opposition to unions. The second *Cardinal Towing* factor is whether an action's narrow scope "defeats an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem."  This Court's earlier ruling found that the fact that § 211-a applied to "*all State contracts*" pointed towards regulation.  388 F.Supp.2d at 17 (emphasis in original).  As discussed above, § 211-a will only apply to a narrow range of contracts under standards set by the Second Circuit.

Even when regulation exists, States still are not preempted "from regulating

---

[14] Plaintiffs' Brief implies (at 11) that Defendants somehow abandoned their argument that the State acts under § 211-a as a market participant or proprietor, not a regulator, through a filing that did not refer to "the market participant exception, enunciated in *Bldg. & Constr. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218 (1993) ('*Boston Harbor*')."  Some decisions, including those of this Court and the Second Circuit in the present case, 388 F.Supp. 2d at 23 and 471 F.3d at 108, refer to a "market participant exception."  Others, including *Boston Harbor* itself, 507 U.S. at 227, simply distinguish "between government as regulator and government as proprietor." Defendants have always maintained that § 211-a is proprietary.

aspects of labor relations… 'touch[ing] interests… deeply rooted in local feeling and responsibility." *Machinists*, 427 U.S. at 136 (quoting *Garmon*, 359 U.S. at 244). Ensuring that State funds are used only for the purpose for which they were appropriated, *see* § 211-a(1), is a deeply rooted State responsibility.  New York's current economic and budgetary crisis, made very clear and public throughout the last year, adds even greater urgency and import to the desire to ensure appropriate use of State resources and application of public monies only to the purposes for which they were awarded.  As discussed above, the statute was not intended to be and will not be applied more broadly.

<strong>CONCLUSION</strong>

For these reasons, plaintiffs' summary judgment motion must be denied.

Respectfully submitted,

Patricia Kakalec
Chief of Labor Bureau

ANDREW M. CUOMO
Attorney General of New York

By: _____

Seth Kupferberg
Assistant Attorney General
Bar Roll No. 512014
120 Broadway, 26th Floor
New York, New York 10271
(212) 416-8856